Filed 4/20/18 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SALVADOR OSWALDO CHAVEZ et al.,<br><br>    Defendants and Appellants. | D069533<br><br><br><br>(Super. Ct. No. SCS273327)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 28, 2018, be modified as follows:

1.  On page 1, the first two prefatory statements are deleted and replaced with the following:

> APPEALS from judgments of the Superior Court of San Diego County, Stephanie Sontag, Judge.  Affirmed in part, reversed in part, and remanded with directions.

2.  On page 3, the third full sentence is deleted and replaced with the following:

> Based on our reasoning *post*, we remand the matter for resentencing Gonzalez to allow the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (h)

enhancement under section 1385.  In all other respects, the judgments are affirmed.

3.  On page 7, footnote 7 is deleted and replaced with the following:

The trial court imposed a total consecutive determinate term of seven years, consisting of the lower term of two years for count 2, two years for the section 12022.1, subdivision (b) enhancement, and three years for Gonzalez's three prior prison terms (§ 667.5, subd. (b)).  As Gonzalez notes, the court's minute order and abstract of judgment do not accurately reflect the consecutive determinate sentence it imposed.  Instead of the two-year term it imposed for count 2, they erroneously indicate a three-year term was imposed.  Accordingly, we direct the trial court, on remand for resentencing Gonzalez, to issue a new minute order and amended abstract of judgment to, inter alia, reflect the correct consecutive two-year term imposed for count 2.

4.  On pages 69 through 71, section IX(C) is deleted and replaced with the following:

Gonzalez argues that because section 12022.53, subdivision (h) applies retroactively to his nonfinal judgment, the matter should be remanded for resentencing to allow the trial court to decide whether to exercise its discretion thereunder to strike or dismiss the 25-year-to-life section 12022.53 firearm enhancement that it originally imposed on him pursuant to former section 12022.53.  We agree.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.]  A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.]  In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

In this case, the record does not clearly indicate the trial court would have declined to strike or dismiss the section 12022.53,

2

subdivision (h) firearm enhancement if it had the discretion to do so at the time of Gonzalez's sentencing. Although the court expressed its concern regarding his criminal history, his "senseless" shooting of Crook, and his use of a gun while he (Gonzalez) was out on bail on a previous gun charge, the court nevertheless exercised its sentencing discretion to impose a lower two-year term for his count 2 conviction for assault with a deadly weapon rather than the upper four-year term recommended by the probation department. The court explained that it did not "think that [it] is quite fair" to impose on Gonzalez, as an aider and abettor of that offense, an upper four-year term when the probation department recommended only a lower two-year term for Chavez, who was the actual perpetrator of that offense. Contrary to the People's assertion, the court therefore did not impose the maximum sentence allowed under the law.

Furthermore, the record does not contain any statement by the trial court indicating that it would have imposed the section 12022.53, subdivision (h) enhancement even if it had the discretion to strike or dismiss that enhancement at the time of Gonzalez's sentencing. In *People v. Gutierrez* (1996) 48 Cal.App.4th 1894 (*Gutierrez*), cited by the People, the trial court indicated that it would not have exercised its discretion to impose a lesser sentence even if it had the discretion to do so. First, the court imposed an upper term for the defendant's robbery conviction. (*Id.* at p. 1896.) Second, noting that the defendant was " 'the kind of individual the law was intended to keep off the street as long as possible,' " the court chose not to strike either of two section 667.5, subdivision (b) enhancements. (*Ibid.*) Because the trial court imposed the maximum sentence on the defendant, *Gutierrez* concluded "no purpose would be served in remanding" for resentencing to allow the court to exercise its new discretion to strike or dismiss the three strikes allegation under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. (*Gutierrez*, at p. 1896.)

Unlike the trial court in *Gutierrez*, the trial court in this case did not impose on Gonzalez the maximum sentence possible and, in particular, imposed a lower two-year term for his count 2 conviction for assault with a deadly weapon. Also unlike the trial court in *Gutierrez*, the court in this case did not state that Gonzalez should be "[kept] off the street as long as possible" or make any other statement clearly indicating that it would not have exercised discretion to strike or dismiss the section 12022.53, subdivision (h) enhancement even if it had the discretion to do so at the time of

3

Gonzalez's sentencing. (*Gutierrez*, *supra*, 48 Cal.App.4th at p. 1896.) Absent such a clear indication, the appropriate remedy is to remand for resentencing to allow the trial court to consider whether to exercise its discretion to strike or dismiss the section 12022.53, subdivision (h) enhancement under section 1385. (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) We express no opinion regarding how the trial court should exercise its discretion under section 12022.53, subdivision (h).

5. The disposition is deleted and replaced with the following:

Gonzalez's sentence is vacated and the matter is remanded for resentencing for the limited purpose of allowing the trial court to consider whether the section 12022.53, subdivision (h) enhancement should be stricken or dismissed under section 1385. The trial court is directed to issue a new minute order and an amended abstract of judgment after such resentencing to reflect the correct consecutive two-year term imposed for count 2 and whether it strikes or dismisses, or imposes, the section 12022.53, subdivision (h) enhancement. The court shall forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

BENKE, J., modification to the concurring and dissenting opinion.

In light of the majority's modification of the opinion, I now concur and in doing so modify my concurring and dissenting opinion as follows:

1. On page 1 reference to "Concurring and dissenting" should be changed to delete the words "and dissenting" so it now reads "BENKE, J., Concurring."

2. On page 1, first paragraph, the fourth sentence starting with "On the question of remand," should be deleted.

3. On page 1, second paragraph, footnote 2, delete reference to *People v. Woods* (2018) Cal.App.5th 1080.

4

4.  On page 1, footnote 3, the words "in full" are added to the first sentence prior to beginning the quote, so that the sentence now reads as follows:

> In *Robbins*, the court, which did not have the benefit of *Lara*, stated in full:

5.  On page 4, the first sentence of the first full paragraph starting with the words "The language of footnote 5 in *Lara*" is deleted, and the following paragraph is added:

> My colleagues conclude that in footnote 5 of *Lara*, the Supreme Court has instructed that the terms "presumption" and "inference" should be read as interchangeable and in footnote 5, the Supreme Court has expressed a desire we use the term "inference" to mean both.  (See maj. opn., p. 67, fn. 21.)  Thus, the majority treats the terms as the same for purposes of their analysis, and chooses to use the term "inference."  Superficially, this might lead to the conclusion we are in agreement that the use of inferences controls the outcome of the issue here.  However, if I am correct, that the majority believes the terms are interchangeable, and an inference is a presumption, we are in stark disagreement.  I choose to analyze the majority opinion as applying a "presumption" of retroactivity as does *Robbins* and employ the definitions directed by the Evidence Code.

6.  On page 7, the last paragraph starting with the words "Finally, I part company" is deleted in its entirety.

This modification changes the judgment against Gonzalez.  It does not change the judgment against Chavez.

The petition for rehearing is denied.

BENKE, Acting P. J.

Copies to:  All parties

5

Filed 3/28/18 (unmodified version)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D069533 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS273327) |
| SALVADOR OSWALDO CHAVEZ et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County, Stephanie Sontag, Judge. Affirmed with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Salvador Oswaldo Chavez.

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Arce Gonzalez.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

Summer Stephan, District Attorney, Mark A. Amador, Chief Deputy District Attorney, Linh Lam, Assistant Chief Deputy District Attorney, and Vanessa C. Gerard Benner, Deputy District Attorney, as Amicus Curiae on behalf of Plaintiff and Respondent.

Following a physical altercation involving two groups of men, defendant Salvador Oswaldo Chavez knifed a member of the other group in the back and defendant Daniel Arce Gonzalez shot and killed another member of that group. Chavez and Gonzalez appeal judgments following their jury convictions of second degree murder (Pen. Code, § 187, subd. (a))[1] and assault with a deadly weapon (§ 245, subd. (a)). On appeal, Chavez contends: (1) the trial court erred by admitting an eyewitness's in-court identification of him that was the result of an unduly suggestive pretrial identification procedure; (2) the court erred by improperly limiting the scope of opinion testimony by his eyewitness identification expert; (3) there is insufficient evidence to support his conviction of second degree murder; and (4) the court erred by instructing with CALCRIM No. 571 on imperfect self-defense or imperfect defense of another but omitting imperfect defense of Gonzalez. Gonzalez joins in Chavez's contentions and also contends: (1) the trial court erred by instructing with CALCRIM No. 3471 on the right of self-defense but omitting language stating that an aggressor who initially uses only nondeadly force regains the right to self-defense when his or her opponent counters with deadly force; (2) the court erred by instructing with CALCRIM No. 3472, but not

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

2

modifying it with language stating that a person who provokes a fight with an intent to use nondeadly force regains the right to self-defense when his or her opponent counters with deadly force; and (3) the court abused its discretion under Evidence Code section 352 by admitting the testimony of an eyewitness regarding the death threat he (Gonzalez) made to dissuade that eyewitness from testifying at trial, and also abused its discretion by denying his motion for mistrial.  Chavez joins in Gonzalez's contentions.  After the parties submitted their briefs in this case, Gonzalez filed a supplemental brief arguing that we should:  (1) conclude the provisions of 2017 Senate Bill No. 620, effective January 1, 2018, apply retroactively to judgments not yet final; and (2) remand the matter for resentencing to allow the trial court to exercise its discretion to strike or dismiss the section 12022.53 firearm enhancement.  Based on our reasoning *post*, we affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

On June 17, 2014, the Rincon Del Mar restaurant in National City was filled with customers, many of whom were there to watch the World Cup soccer match between Mexico and Brazil.  There was one group of customers with ties to Tijuana, including Gonzalez, Chavez, Alfonso Vasquez, Vincente Roldan, and brothers Vicente Gutierrez (Vicente) and Rafael Gutierrez (Rafael).  Another group of customers had ties to National

City, including Josue Crook, Edward (also known as Eddie) Lopez, Jesus Morfin, Anthony Aguilar, Tomas (also known as Tommy) Lujan, and Enrique Chavez.[2]

After the match, Rafael argued with Morfin in front of the restaurant about whether he had a problem with his brother Vicente. When Morfin approached Vicente, Vicente punched him in the face, causing him to fall to the ground unconscious. Vicente and Rafael beat Morfin while he was unconscious on the ground. Meanwhile, Gonzalez hit Aguilar in the face, causing him to fall unconscious onto Lujan who had been standing nearby. While on the ground, Lujan was punched by Gonzalez. Lujan escaped by crawling under a flatbed truck that was parked on the street directly in front of the restaurant. When Lujan tried to get out from under the truck, Gonzalez kicked him in the face. From under the truck, Lujan saw Gonzalez pacing back and forth, holding a pistol by his side. During the fight, Gonzalez and Chavez at times were back-to-back and then face-to-face. Other members of the two groups also began fighting with each other.

After Juan Carlos Lopez, the restaurant's owner, broke up the initial physical altercation, the combatants moved away from the restaurant. Rafael and Vicente ran southward as Eddie Lopez chased them.[3] When Eddie Lopez was about 15 feet away from them, he threw a beer bottle at them, possibly striking one of them, and then ran back toward the restaurant. While Eddie Lopez was running after them, Gonzalez ran in

[2] To avoid confusion, we refer to defendant Salvador Chavez by his last name and Enrique Chavez by his full name.

[3] We refer to Juan Carlos Lopez and Eddie Lopez by their full names to avoid confusion.

4

Eddie Lopez's direction and, from a distance, pointed a gun at his back. Crook, who had just come out of the restaurant, and Lujan approached Gonzalez from behind and Crook tapped him on the shoulder. Gonzalez spun around and shot Crook twice at point-blank range, striking him in the chest near his armpit and in the upper right side of his back.[4] Immediately before being shot, Crook put up his hands and began turning away from Gonzalez. Except for possibly a plastic cup, Crook did not have anything in his hands at the time and no weapons were found on or near him. Gonzalez then pointed his gun at Lujan, but Juan Carlos Lopez intervened and begged him not to shoot. Crook died from his gunshot injuries.

While Eddie Lopez was running away from the Gutierrez brothers, he saw Chavez chasing after him with a knife in his hand. However, immediately after Gonzalez shot Crook, Chavez stopped his chase and ran eastward with Gonzalez. Chavez and Gonzalez got into a black truck and fled the scene. Remaining at the scene, Eddie Lopez felt his shirt was wet and then realized he had been stabbed in the back.[5]

---

[4]    According to Lujan, at the time of the shooting, he (Lujan) was 12 feet away from where the shooting occurred.

[5]    A video recording from the restaurant's surveillance camera in the exterior front area of the restaurant showed, inter alia, Chavez at the time of the initial physical altercation holding an object in a manner consistent with someone holding a folding knife. However, because the camera's angle or range was limited, the recording did not show Eddie Lopez throwing the beer bottle at the Gutierrez brothers, Gonzalez pointing his gun at Eddie Lopez, Crook approaching Gonzalez from behind and tapping his shoulder, Gonzalez turning and shooting Crook, or Chavez stabbing Eddie Lopez in the back.

Gonzalez was arrested in Mexico and extradited to the United States. Police searched Chavez's house and found two folding knives and clothing matching what he was seen wearing on the day of the shooting. Juan Carlos Lopez told police the restaurant's surveillance camera was inoperable because a car crashed into the restaurant two to three weeks before the shooting. However, police searched the restaurant and found a flash drive containing a five- to seven-minute video recording from one of its surveillance cameras, which recording showed, inter alia, the initial physical altercation between the two group's members and Crook placing an object on the flatbed truck and then picking it back up before the shooting. During a police interview, Juan Carlos Lopez admitted he initially lied about not seeing who shot Crook because he feared retaliation. Cell phone records showed there were 12 calls between Gonzalez's phone and Chavez's phone on the day of the shooting.

An information charged Gonzalez and Chavez with the murder of Crook (§ 187, subd. (a)) and the assault on Eddie Lopez with a deadly weapon (§ 245, subd. (a)(1)). It also alleged that Gonzalez committed the murder while out of custody on bail pending a final judgment for a prior felony offense (§ 12022.1, subd. (b)), personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and had served three prior prison terms (§ 667.5, subd. (b)).

At the joint trial of Gonzalez and Chavez, the prosecution presented evidence substantially as described *ante*. In his defense, Gonzalez presented, inter alia, the testimony of Roldan, who stated he was hit during the fight and knocked to the ground. Roldan did not see either Gonzalez or Chavez attack or shoot anyone. In his defense,

6

Chavez presented the testimony of Scott Fraser, an eyewitness identification expert, who testified generally about how alcohol, memory convergence, and stress could result in an eyewitness's faulty memory. The jury found Gonzalez and Chavez guilty on both counts and found true the firearm allegation.[6] The trial court sentenced Gonzalez to an indeterminate term of 40 years to life in prison plus a consecutive determinate term of seven years.[7] The court sentenced Chavez to an indeterminate term of 15 years to life in prison plus a consecutive determinate term of two years. Gonzalez and Chavez each timely filed a notice of appeal challenging the judgments against them.

DISCUSSION

I

*Admission of Eddie Lopez's Identification of Chavez*

Chavez contends, and Gonzalez joins in his contention, that the trial court erred by admitting Eddie Lopez's in-court identification of him (Chavez) as the man who stabbed him. In particular, Chavez argues Eddie Lopez's in-court identification was the result of

---

[6] Gonzalez subsequently admitted the truth of the other allegations.

[7] The trial court imposed a total consecutive determinate term of seven years, consisting of two years for count 2, two years for the section 12022.1, subdivision (b), enhancement, and three years for Gonzalez's three prior prison terms (§ 667.5, subd. (b)). As Gonzalez notes, the court's minute order and abstract of judgment do not accurately reflect the consecutive determinate sentence it imposed. Instead of the two-year term the court imposed for count 2, they erroneously indicate a three-year term was imposed. Accordingly, we direct the trial court to issue a new minute order nunc pro tunc and amended abstract of judgment to reflect the correct consecutive two-year term imposed for count 2.

7

a pretrial identification procedure that was unduly suggestive and that pretrial identification was unreliable under the totality of the circumstances.

A

Before trial, Chavez filed an in limine motion to exclude evidence of Eddie Lopez's pretrial identification of him as the man who stabbed him in the back. Noting that during a pretrial interview with police Eddie Lopez described his attacker as wearing a red T-shirt and blue jeans and the police detective showed him only his (Chavez's) photograph, he argued Eddie Lopez's pretrial identification was unduly suggestive and should be excluded because there were at least two people wearing red shirts and blue jeans. He also argued the photograph shown Eddie Lopez depicted him (Chavez) holding something in his hand, which made the pretrial identification more suggestive.

The prosecutor opposed the motion, arguing Eddie Lopez's pretrial identification was not unduly suggestive and was reliable based on the totality of the circumstances. The prosecutor described the circumstances of that pretrial identification. On June 25, 2014, eight days after the incident, National City Police Detectives Depascale and Ballardo interviewed Eddie Lopez at the National City Police Department. When shown various photographs taken about the time of the incident, Eddie Lopez recognized and/or identified many of the persons shown in the photographs. Eddie Lopez then described his assailant, stating: "There was another guy, a fat, short guy in a red t-shirt and blue jeans. He's the one who stabbed me." Eddie Lopez stated he did not see his assailant until he turned around and saw his assailant with a knife. Detective Ballardo left the room and returned with one photograph, which he placed in front of Eddie Lopez without

8

saying anything. Eddie Lopez immediately stated: "[T]hat's him, that's the guy who stabbed me." He did not identify the person shown in the photograph as Chavez by name, but only as the man who stabbed him. The prosecutor argued Eddie Lopez's identification of Chavez, as shown in the photograph, was not unduly suggestive because he had been shown other photographs before instantly identifying the photograph depicting Chavez in a red T-shirt and blue jeans as his assailant. The prosecutor also argued the fact that the photograph showed Chavez holding something in his hand did not make the pretrial identification unduly suggestive or unreliable because Eddie Lopez immediately identified the man in the red T-shirt and blue jeans (i.e., Chavez) as his assailant before having sufficient time to closely examine the photograph and see that the man had something in his hand. The prosecutor conceded there was another man at the restaurant that day, but that man (Maurice Lopez) was wearing white shorts and not blue jeans. Also, the prosecutor noted that during a July 10, 2014 interview with police Chavez identified himself as the man depicted in surveillance camera photographs wearing the red shirt. Accordingly, the prosecutor argued the evidence of Eddie Lopez's pretrial identification of Chavez should be admitted in evidence at trial.

At the hearing on Chavez's motion, counsel repeated the arguments they made in their papers. Chavez argued he did not want Eddie Lopez's pretrial identification of him to be admitted as a "backhanded" identification even though the prosecutor apparently planned to have Eddie Lopez identify him (Chavez) as his assailant at trial. The trial court commented: "So really the issue is whether that identification impacts [Eddie]

9

Lopez['s] identification of Mr. Chavez at trial." The court denied the motion, finding there was nothing unduly suggestive about the pretrial identification.

At trial, Eddie Lopez testified regarding the incident and, in particular, described the man he saw running after him holding a knife. He described the man as "[j]ust a little heavyset, red t-shirt, blue jeans." From a distance of about 10 feet, he saw the man holding a knife with a blade that was "maybe a couple of inches long." When shown the surveillance camera photograph of Chavez, Eddie Lopez stated it "looks like the guy that was running behind me" and confirmed it was a fair and accurate photograph of that man. He thought he remembered telling the man to put the knife down. When asked whether he saw that man in court, Eddie Lopez stated: "I'm not sure. I mean I just remember the clothing and I remember that." When shown the video recording from the restaurant's surveillance camera, Eddie Lopez stated that he recognized the man in the red shirt and blue jeans shown in the recording. On cross-examination, Eddie Lopez stated he did not know the name of the man shown wearing the red shirt and blue jeans. On redirect examination, he confirmed the only person he saw with a knife was the man wearing the red shirt. He could not say whether that man had stabbed him, but he saw that man behind him with a knife in his hand.

Detective Depascale testified at trial and stated he and Detective Ballardo had spoken with Eddie Lopez on about June 25, 2014, at the police station. He stated they did not show Eddie Lopez the video recording from the surveillance camera, but had shown him about five still photographs from that recording. On cross-examination, Chavez's counsel asked Depascale: "When [Eddie] Lopez identified the man in the red

10

shirt, isn't it true that Detective Ybarra [*sic*] came in and showed him a picture, correct?" Depascale replied, "Yes, came in and placed a picture on the interview room table." Chavez's counsel asked: "And the picture only had the man in the red shirt on it, correct?" Depascale replied, "No, sir." Chavez's counsel then asked Depascale questions about a still photograph (exh. No. 14) that had been taken from the surveillance video recording.

B

"In order to determine whether the admission of identification evidence violates a defendant's constitutional right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*).) A single person showup, or a single person photograph, is not inherently unfair or suggestive. (*People v. Clark* (1992) 3 Cal.4th 41, 136; *People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*).) "Showing the witnesses a single photo of the defendant is no more *impermissibly* suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom." (*People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009.) A single person photograph is analogous to a single

11

person showup that "may pose a danger of suggestiveness, but such lineups or showups are not necessarily or inherently unfair." (*Clark*, at p. 136.) An identification of a defendant at trial, which is based on an unduly suggestive and unreliable pretrial identification that posed a very substantial likelihood of irreparable misidentification, violates a defendant's constitutional right to due process. (*Neil v. Biggers* (1972) 409 U.S. 188, 196-198.)

The defendant has the burden of demonstrating an identification procedure was unduly suggestive or unreliable. (*People v. Avila* (2009) 46 Cal.4th 680, 700.) On appeal, we review de novo, or independently, a trial court's conclusion whether or not an identification procedure is unduly suggestive or unreliable under the totality of the circumstances. (*Id*. at pp. 698-699.) If an identification procedure was not unduly suggestive, there is no violation of a defendant's due process right. (*Ochoa*, *supra*, 19 Cal.4th at p. 412.) If a defendant's federal constitutional right to due process is violated, reversal of the defendant's conviction is required unless the People show that error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

C

Chavez asserts Eddie Lopez's pretrial identification of him as his assailant was the result of the impermissibly suggestive identification procedure used by the National City Police detectives during their pretrial interview of Eddie Lopez and his pretrial identification was also unreliable under the totality of the circumstances. Chavez therefore argues the trial court erred by admitting Eddie Lopez's in-court identification of

12

him (Chavez) as his assailant, which identification was the result of, or tainted by, his pretrial identification.[8] However, based on our independent review of the record, we conclude that the pretrial identification procedure used by the detectives was not unduly suggestive and Eddie Lopez's identification of the photograph depicting the man who attacked him (i.e., Chavez) during that procedure was reliable under the totality of the circumstances.

During their pretrial interview of Eddie Lopez, the detectives first questioned him and ascertained his detailed version of events before showing him photographs of various persons from the restaurant's surveillance camera video recording. After not recognizing any of those persons as his assailant, Eddie Lopez stated: "There was another guy, a fat, short guy in a red t-shirt and blue jeans. He's the one who stabbed me." Detective Ballardo left the room and returned with a single photograph depicting a man wearing a red shirt and blue jeans (i.e., Chavez, per his own subsequent admission to police) obtained from the surveillance camera video recording. Without saying anything,

_____

[8]     Chavez apparently does not, nor could he persuasively, assert the trial court erred by admitting evidence of Eddie Lopez's *pretrial* identification of him as his assailant because Chavez does not cite to the record showing the prosecutor presented such evidence on direct examination of Eddie Lopez, Depascale, or other witnesses. Rather, at trial it was *Chavez's counsel* who, on cross-examination of Depascale, first raised the topic of Eddie Lopez's pretrial identification of Chavez as his assailant during the detectives' interview. Chavez's counsel asked Depascale: "When [Eddie] Lopez identified the man in the red shirt, isn't it true that Detective Ybarra [*sic*] came in and showed him a picture, correct?" Depascale replied, "Yes, came in and placed a picture on the interview room table." Accordingly, Chavez apparently argues on appeal only that the trial court erred by admitting Eddie Lopez's in-court testimony identifying the photograph of the man wearing a red T-shirt and blue jeans (i.e., Chavez) as depicting his assailant, which identification purportedly was based on, or resulted from, the prior unduly suggestive and unreliable pretrial identification procedure used by the detectives.

13

Ballardo placed the photograph in front of Eddie Lopez, who immediately stated: "[T]hat's him, that's the guy who stabbed me."

Although single photograph lineups may be suggestive and not the preferred identification procedure, we cannot conclude Eddie Lopez's pretrial identification of Chavez was *unduly* suggestive in the circumstances of this case. The detectives did not present Eddie Lopez with just one photograph during their interview, but showed him a number of photographs before he spontaneously described his assailant to them. Given that description, Ballardo obtained a still photograph of a man matching that description from the restaurant's surveillance camera video recording. The photograph did not bear any markings or titles and Ballardo did not make any statement when he placed it in front of him. Without hesitation, Eddie Lopez identified the man depicted in the photograph as his assailant. Although that identification procedure was suggestive, it was not unduly suggestive. Ballardo simply presented Eddie Lopez with a photograph from the surveillance camera video recording of a man that matched his description of his assailant and did not expressly or implicitly attempt to persuade Eddie Lopez to identify that man as his assailant.

Assuming arguendo that pretrial identification procedure was unduly suggestive, we nevertheless conclude Eddie Lopez's pretrial identification of the man in the photograph (i.e., Chavez) was reliable under the totality of the circumstances. Most importantly, the man wearing a red T-shirt and blue jeans depicted in the photograph was the only person shown in the surveillance camera video recording before or during the incident who was wearing that type of clothing. The only other man with a red T-shirt

14

was wearing white shorts, not blue jeans, and had a distinctively different appearance.[9] Furthermore, the man depicted in the photograph also matched Eddie Lopez's additional description of his assailant as a "fat" and "short" man. He also had an excellent opportunity to view his assailant at the time. He turned around and faced him from a distance of only 10 feet and asked him to put the knife down. He viewed the man long enough to remember what he was wearing (i.e., red T-shirt and blue jeans) and his body type (i.e., fat and short). His pretrial identification of the man in the photograph as his assailant was made only eight days after the attack. Finally, the immediacy and certainty of his pretrial identification of the man depicted in the photograph as his assailant supports the reliability of his identification. Based on our consideration of the totality of the circumstances, we conclude Eddie Lopez's pretrial identification of the man depicted in the photograph as his assailant (i.e., the man who chased him with a knife) was reliable. (*Cunningham*, *supra*, 25 Cal.4th at p. 989.) Because Eddie Lopez's pretrial identification was reliable, it did not violate Chavez's federal constitutional due process right and the trial court properly allowed him to testify that the man shown in that photograph (i.e., Chavez) depicted his assailant. (*Ochoa*, *supra*, 19 Cal.4th at p. 412.)

---

9    Based on our independent viewing of the video recording, we note another man came out of the restaurant and appeared in front of it only *after* the shooting occurred. Although that man was wearing a red, short-sleeved T-shirt and blue jeans, he also wore a dark, long-sleeved T-shirt underneath his short-sleeved shirt and could not reasonably be described as "fat" or "short," as per Eddie Lopez's description of his assailant. Accordingly, the photograph shown to him (i.e., depicting Chavez) was the *only* man shown in the video recording as present in front of the restaurant before or at the time of the shooting of Crook and the attack on Eddie Lopez who was wearing a red T-shirt and blue jeans.

15

Contrary to Chavez's assertion, that in-court identification was not the result of, or tainted by, any unduly suggestive pretrial identification procedure or unreliable pretrial identification. *People v. Rodriguez* (1977) 68 Cal.App.3d 874, cited by Chavez, is factually inapposite to this case and does not persuade us to reach a contrary conclusion. Furthermore, neither the fact the man in the photograph appeared to be holding an object that possibly could have been a knife, nor Eddie Lopez's prior unfamiliarity with that man, made his pretrial identification unreliable based on the totality of the circumstances.

II

*Limitation on Opinion Testimony by Chavez's Eyewitness Identification Expert*

Chavez contends the trial court erred by improperly limiting the scope of opinion testimony by Fraser, his eyewitness identification expert.

A

Before trial, Chavez filed an in limine motion to allow him to present testimony by an eyewitness identification expert. His motion did not state the specific nature or content of his expert's expected testimony. The prosecution opposed the motion, arguing such expert testimony should be excluded because there was substantial corroboration of the eyewitnesses' identification of Chavez and Gonzalez. The trial court granted Chavez's motion, but stated the prosecution had the discovery right to receive his expert's reports and information regarding the expected substance of his testimony.

After the prosecution completed its case-in-chief, Chavez's counsel presented the prosecution and the trial court with a letter from Fraser, his eyewitness identification

16

expert, regarding the expert's expected testimony.[10] The prosecutor described the content of that letter, stating the expert's expected testimony would relate to the "general topics of fight or flight, conscious transference, memory decay, and confluences." She moved to exclude that type of testimony, arguing it potentially affected witness credibility issues. Chavez's counsel replied that those issues were within the broad topic of witness identifications and should be admitted.

The trial court noted that before trial the proffered eyewitness identification testimony appeared to be pertinent, but that the expert's letter appeared to enlarge the scope of that testimony. The prosecutor objected to the enlarged scope of the expert's testimony, referring to "the last couple of sentences of the first paragraph, that he be offered to testify about situations in which witnesses misperceive a harmless object to be a lethal weapon and provide an opinion about the discrepancies in Mr. Lujan's [*sic*] testimony regarding his purported knife wound and his contradictory statement at trial. I think that this is again going a little bit a foul of the jury's [province] and determination of a witness's credibility . . . ." The court agreed, stating: "I don't know how he's going to comment on anybody's testimony." Chavez's counsel then stated that he planned to use hypotheticals. He stated that until the previous night he did not know the depth of his expert's knowledge. The prosecutor again stated the expert's expected testimony was "dangerously coming close to opining about the credibility of a specific witness, given the way that this particular letter is written." The court indicated that an Evidence Code

---

10    The record on appeal does not include a copy of that letter and the parties have not lodged it with this court.

section 402 hearing may be needed to ascertain exactly what the expert's testimony would be, stating: "[b]ecause a general statement . . . that somebody can see something take it as a weapon when it's not, I'm not sure that's [a] subject appropriate for expert testimony. The fact that a witness's statement might conflict with something that he said before, again I don't see that that's [a] subject [for] expert testimony."

Chavez's counsel stated:

"Just to clarify, the intent is for Dr. Fraser to explain that these witnesses are not untruthful, they are not fabricating evidence, but there are certain processes in the brain that occur after witnessing a traumatic event, which he can explain . . . what the cause of the discrepancies is; that these people are not lying, they are not disingenuous, they have suffered whatever memory decay, conscious transference, misperception, post-observational influences. And these are all things that affect the memory retention after a traumatic event. And that is what he is going to testify to explain to the jury why the inconsistent stories, based on scientific research, and explain why they may happen based on hypotheticals."

The court replied:

"Well, I wouldn't allow a hypothetical. I would—because—well, the most I would allow is if there are studies that—where [Fraser] can state that after a traumatic event that witnesses are not always reliable because of other factors that are going through—chemical or otherwise, through the brain, that is one thing, but *to comment on specific evidence, no. To comment on somebody, even hypothetical or not to comment on what you perceive to be discrepancies, you argue that to the jury.* That is what the juries are for. They are the fact finders. They find whether there are material discrepancies between witness statements. *It is not up to your expert to decide whether there are discrepancies, and if there are discrepancies, why.* " . . . [I]f there's a foundation for the expert's opinion concerning the reliability of eyewitnesses of an event after a traumatic event, if there is a basis for that generally, I might allow it, but not commenting hypothetically or otherwise on specific witness's testimony*, because the jury's going to decide whether there's

18

discrepancies. . . . It's up to them to decide whether they are reliable witnesses." (Italics added.)

The court stated that was its ruling and then asked the prosecutor whether she would like an Evidence Code section 402 hearing.[11] The court stated: "If there's [a] foundation for [Fraser's] being able to *testify as to general reliability of any witness after a traumatic event, such as a shooting, I would allow that without specifics*." (Italics added.) After the prosecutor expressed concern regarding the court's use of the term "reliability," the court agreed and clarified what it meant to say was that "if [Fraser] has studies concerning brain chemistry, that kind of thing about people in traumatic situations, he may testify as to that." The court stated it would not allow expert testimony "as to reliability of witnesses, but [would as to] brain chemistry changes, things like that if there are appropriate studies."

Chavez's counsel then proffered what type of hypothetical question he would pose to Fraser, stating:

> "[M]y hypothetical would have just listed individual A, alleged victim; individual B, his friend; individual D, the defendant. And, basically, I would have gone through hypotheticals, which are similar, but not identical, and not requesting that [Fraser] tell the credibility of the particular[] witness A or B, but explain what psychological brain chemistry or what psychological factors would explain for the discrepancies."

The court ruled that it would not allow that type of expert testimony.

Chavez then presented Fraser's expert testimony generally on how alcohol, memory convergence, and stress could cause an eyewitness to have a faulty memory.

---

11    It appears there was no Evidence Code section 402 hearing conducted thereafter.

19

B

Evidence that is relevant is generally admissible at trial. (Evid. Code, §§ 210, 350.) A criminal defendant has the right to present the testimony of witnesses in his or her defense, subject to a court's application of ordinary rules of evidence which generally does not infringe on a defendant's right to present a defense. (*People v. Cromwell* (2005) 45 Cal.4th 50, 82.) In particular, a court may exclude relevant evidence pursuant to Evidence Code section 352. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

Evidence Code section 801 allows expert opinion testimony on subjects that are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." However, an expert witness may not give testimony that "amounts to no more than an expression of his [or her] general belief as to how the case should be decided." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 651.)

Regarding eyewitness identifications, expert testimony may be allowed to "inform[] the jury of certain factors that may affect such an identification in a typical case." (*People v. McDonald* (1984) 37 Cal.3d 351, 370 (*McDonald*).) "[T]o the extent that [expert testimony] may refer to the particular circumstances of the identification before the jury, such testimony is limited to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness." (*Id*. at pp. 370-371.) Accordingly, a trial court may exclude expert testimony "that any particular witness is or is not truthful or accurate in his [or her] identification of the defendant." (*Id*. at p. 370.)

20

On appeal, we review a trial court's ruling on the admissibility of expert testimony on psychological factors affecting eyewitness identification for abuse of discretion. (*McDonald*, *supra*, 37 Cal.3d at p. 377.) Nevertheless, "[e]xclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability." (*People v. Jones* (2003) 30 Cal.4th 1084, 1112.) Although a "defendant has the general [constitutional] right to offer a defense through the testimony of his or her witnesses [citation], . . . a state court's application of ordinary rules of evidence . . . generally does not infringe upon this right [citations]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82; see also *Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327 [application of ordinary rules of evidence generally does not infringe on a defendant's constitutional right to present a defense].)

C

Chavez's contention is premised on his assumption that the trial court's ruling excluded any testimony by Fraser on the issues of fight or flight, conscious transference, memory decay, and confluences, and prohibited him from using hypothetical questions or discussing psychological facts that may explain discrepancies in witness statements. However, the record on appeal does not support that premise. Based on our reading of the trial court's ruling, quoted *ante*, it is clear the court excluded only expert testimony, whether directly or hypothetically, on how a traumatic event or other psychological factors affected a *specific* witness's memory or the reliability of that witness's identification. The court stated that it would not allow Fraser "*to comment on specific evidence*" or to comment on discrepancies in a *specific* witness's identification, whether

21

by hypothetical questions or otherwise. (Italics added.) The court noted it was the jury's function, and not the expert's function, to decide whether there were discrepancies in a specific witness's identification or other statements. The court restated its ruling, explaining it would allow expert testimony on eyewitness identifications generally (e.g., on the effect of traumatic events generally), but would not allow Fraser to "*comment*[] *hypothetically or otherwise on specific witness's testimony*." (Italics added.) Accordingly, contrary to Chavez's assertion, the court did not exclude *general* expert testimony on the issues of fight or flight, conscious transference, memory decay, and confluences, or from using *general* hypothetical questions to explain those concepts. Rather, the court excluded such expert testimony to the extent it commented on, whether directly or indirectly, on a *specific* witness's identification or other statements or testimony. In so doing, the court did not abuse its discretion. (Cf. *People v. Smith* (2003) 30 Cal.4th 581, 628 [trial court did not abuse its discretion by excluding expert testimony on credibility of defendant's expressions of remorse].) Although the court could have expressed, or elaborated on, its ruling in a more concrete or explicit manner, the gist of its ruling, as we summarized it *ante*, was clear from the record. Accordingly, to the extent Chavez argues the court erred by precluding his expert witness from testifying on those issues generally, he is incorrect.[12]

---

[12] In any event, contrary to Chavez's assertion, there was other substantial corroboration of Eddie Lopez's identification of the man shown in the red shirt and blue jeans in the photograph as his attacker that gave his identification independent reliability. (*Jones*, *supra*, 30 Cal.4th at p. 1112.) In particular, before seeing the photograph, Eddie Lopez told the detectives that a man (i.e., a fat, short guy who was wearing a red T-shirt

22

*Substantial Evidence to Support Chavez's Conviction of Second Degree Murder*

Chavez contends there is insufficient evidence to support his conviction of the second degree murder of Crook.  In particular, he argues there is insufficient evidence to support a finding that he either:  (1) directly aided and abetted Gonzalez's murder of Crook; or (2) aided and abetted an assault with a deadly weapon by Gonzalez and murder was a natural and probable consequence of that assault.

A

Second degree murder is the unlawful killing of a human being with malice aforethought, but without the additional elements required for first degree murder (e.g., willfulness, premeditation, and deliberation).  (§ 187, subd. (a); *People v. Cravens* (2012) 53 Cal.4th 500, 507.)  Malice may be either express or implied.  (*Cravens*, at p. 507.)  Malice is express when a defendant manifests a deliberate intention to kill another person.  (*Ibid.*)  Malice is implied when the killing of another person is proximately caused by an act, the natural and probable consequences of which are dangerous to life, which act was deliberately performed by a person who knows his or her conduct endangers the life of another and acts with conscious disregard for life.  (*Ibid.*)

Under the direct aiding and abetting theory of liability for a crime, a defendant can be found guilty of that crime if he or she knows of the perpetrator's unlawful purpose and

and blue jeans) chased him with a knife shortly before he heard the two gunshots.  The jury viewed the surveillance camera video recording, as well as still photographs therefrom, which showed Chavez was the only person matching that description. Therefore, Eddie Lopez's identification of the man in the photograph as his assailant was substantially corroborated by other evidence.

specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. (CALCRIM No. 401; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

Under the natural and probable consequences theory of aiding and abetting a murder, a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime. (CALCRIM No. 403; *People v. Prettyman* (1996) 14 Cal.4th 248, 261.) As given by the trial court, CALCRIM No. 403 instructs on the natural and probable consequence theory of liability, stating:

> "Before you decide whether the defendant is guilty of murder in the second degree, you must decide whether he is guilty of assault with a deadly weapon or assault with force likely to produce great bodily injury other than the crime charged in Count 2.
>
> "To prove that the defendant is guilty of murder in the second degree, the People must prove that:
>
> "1. The defendant is guilty of assault with a deadly weapon or assault with force likely to produce great bodily injury other than the crime charged in Count 2;
>
> "2. During the commission of assault with a deadly weapon or assault with force likely to produce great bodily injury, a coparticipant in that assault committed the crime of murder;
>
> "AND
>
> "3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault.

24

"A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the assault, then the commission of murder was not a natural and probable consequence of assault.

"To decide whether [the] crime of murder in the second degree was committed, please refer to the separate instructions that I have given you on that crime.

"The People are alleging that the defendant originally intended to aid and abet an assault with a deadly weapon or assault with force likely to produce great bodily injury.

"If you decide that the defendant aided and abetted one of these crimes and that murder in the second degree was a natural and probable consequence of that crime, the defendant is guilty of murder in the second degree. You do not need to agree about which of these crimes the defendant aided and abetted."

"The natural and probable consequences doctrine is based on the recognition that those who aid and abet [a crime] should be responsible for the harm they have naturally, probably, and foreseeably put in motion." (*People v. Avila* (2006) 38 Cal.4th 491, 567.)

Under the natural and probable consequences doctrine, an aider and abettor need not have actually foreseen the nontarget crime; rather, the question is whether, viewed objectively, that the nontarget crime was reasonably foreseeable (i.e., whether a reasonable person in the defendant's position would have, or should have, known the nontarget crime was a reasonably foreseeable consequence of the target crime he or she aided and abetted). (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*); *People v.*

25

*Mendoza* (1988) 18 Cal.4th 1114, 1133 (*Mendoza*); *People v. Nguyen* (1993) 21 Cal.App.4th 518, 535 (*Nguyen*).)  To be reasonably foreseeable, the consequence need not have been a strong probability; rather, a possible consequence that might reasonably have been contemplated is sufficient.  (*Medina*, at p. 920; *Nguyen*, at p. 535.)  "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury."  (*Medina*, at p. 920.)

B

When a defendant challenges the sufficiency of the evidence to support a judgment, we apply the substantial evidence standard of review.  Generally, our task "is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).)  Accordingly, on appeal we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses.  (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13.)

The substantial evidence standard of review involves two steps.  "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences.  [Citation.]  Second, one must determine

26

whether the evidence thus marshaled is substantial. While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.) The standard of review is the same in cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.)

C

Based on our review of the record, we conclude there is substantial evidence to support a finding that Chavez is guilty of the second degree murder of Crook based on the natural and probable consequences doctrine. First, there is substantial evidence to support a finding that Chavez aided and abetted Gonzalez's assault with a deadly weapon or assault likely to cause great bodily injury. As the physical altercation began between members of the National City and Tijuana groups, the surveillance camera video recording shows Chavez holding an object in his hand. Based on Eddie Lopez's testimony that Chavez later chased him with a knife, the jury could reasonably infer the object in Chavez's hand was a knife. During the fight, Gonzalez and Chavez are seen

27

back-to-back and then face-to-face near the flatbed truck. Gonzalez and Chavez are then seen pacing back and forth next to the truck. Lujan, who was under the truck at the time, testified he saw Gonzalez holding a gun at his side while pacing back and forth. The jury could reasonably infer that Chavez saw Gonzalez's gun while pacing back and forth with him. As the initial physical altercation ended and members of the groups headed southward from the restaurant, Eddie Lopez chased the Gutierrez brothers holding a beer bottle in his hand. Gonzalez and Chavez also headed in that direction. Gonzalez pointed his gun at Eddie Lopez's back, while Chavez chased him (Eddie Lopez) holding a knife. Based on that evidence, the jury could reasonably infer Gonzalez and Chavez were acting together, that Gonzalez committed an assault with a deadly weapon on Eddie Lopez or assault likely to cause great bodily injury on Eddie Lopez, and that Chavez intended to, and did, aid and abet that assault. Alternatively stated, there is substantial evidence to support a finding that Chavez knew of Gonzalez's unlawful purpose (i.e., intent to commit an assault with a deadly weapon or assault likely to cause great bodily injury) and specifically intended to, and did in fact, aid, facilitate, promote, encourage, or instigate Gonzalez's commission of that assault.[13] (CALCRIM No. 401.)

Second, there is substantial evidence to support a finding that the murder of Crook was a natural and probable consequence of the assault on Eddie Lopez that Chavez aided

---

[13] Contrary to Chavez's apparent assertion, the target crime of assault with a deadly weapon or assault likely to cause great bodily injury need not have been committed on Crook, as the ultimate murder victim, for the natural and probable consequences doctrine to apply. Accordingly, Gonzalez's assault on Eddie Lopez may serve as the target crime if the nontarget crime of the murder of Crook was a natural and probable consequence of that assault.

28

and abetted. The jury could infer that a reasonable person in Chavez's position should have, or would have, known that murder was a reasonably foreseeable consequence of the assault by Gonzalez that Chavez aided and abetted. (*Medina*, *supra*, 46 Cal.4th at p. 920; *Mendoza*, *supra*, 18 Cal.4th at p. 1133; *Nguyen*, *supra*, 21 Cal.App.4th at p. 535.) Alternatively stated, when Gonzalez assaulted Eddie Lopez by pointing his gun directly at his back, a reasonable person in Chavez's position, while aiding and abetting that assault, would have known murder was a natural and probable consequence of that assault. (CALCRIM No. 403.) Chavez need not have actually foreseen the nontarget crime of murder because, viewed objectively, murder was a reasonably foreseeable consequence of the assault on Eddie Lopez. (*Medina*, *supra*, 46 Cal.4th at p. 920; *Mendoza*, *supra*, 18 Cal.4th at p. 1133; *Nguyen*, *supra*, 21 Cal.App.4th at p. 535.) To be reasonably foreseeable, the consequence need not have been a strong probability; rather, *a possible consequence* that might reasonably have been contemplated is sufficient. (*Medina*, at p. 920; *Nguyen*, at p. 535.)

Accordingly, a reasonable jury could conclude that when Chavez determined to assist Gonzalez in assaulting Eddie Lopez, knowing that Gonzalez was armed with a gun, it was reasonably foreseeable that someone might be shot and killed. The fact that it was Crook, and not Eddie Lopez, who Gonzalez ultimately shot and killed does not preclude application of the natural and probable consequences doctrine. That Lopez's death was particularly foreseeable does not change the fact that death to other potential victims— participants in the brawl (like Crook) or innocent bystanders—was likewise foreseeable when Chavez and Gonzalez escalated an already charged situation by drawing deadly

29

weapons.  (Cf. *People v. Smith* (2014) 60 Cal.4th 603, 619-620 [substantial evidence supported jury's finding that nontarget murders committed during gang jump out were natural and probable consequences of target offenses of disturbing the peace and assault or battery]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1453 ["The jury could reasonably conclude that a reasonable person in defendant's position would have known that escalation was likely to occur when defendant and five other [gang members] confronted three perceived [rival gang members] with the intention of physically attacking them—even if the attack was originally intended as a fistfight.  [Fellow gang member's] shooting of [rival gang member] was a reasonably foreseeable consequence of the assault defendant aided and abetted."]; *People v. Gonzalez* (2001) 87 Cal.App.4th 1, 10-11 [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1053, 1056 [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight].)

To the extent Chavez argues the natural and probable consequences doctrine applies only in gang-related cases, he is mistaken.  Although that doctrine has often been applied in gang-related cases, it can be applied in nongang cases, such as the instant case if all of the elements for its application are proved.  Here, there is substantial evidence to support all of the elements for application of the natural and probable consequences doctrine to find Chavez guilty of the second degree murder of Crook.  None of the cases cited by Chavez are factually apposite to this case or otherwise persuade us to reach a

30

contrary conclusion.[14]  (See, e.g., *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262; *United States v. Andrews* (9th Cir. 1996) 75 F.3d 552.)

IV

*CALCRIM No. 571*

Chavez contends the trial court erred by instructing with CALCRIM No. 571 on imperfect self-defense or imperfect defense of another but omitting imperfect defense of Gonzalez.

A

The trial court instructed with CALCRIM No. 571 on imperfect self-defense or imperfect defense of another, stating:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another.
>
> "If you conclude the defendant acted in complete self-defense or defense of another, his action was lawful and you must find him not guilty of any crime.  The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable.
>
> "The defendant acted in imperfect self-defense or imperfect defense of another if:
>
> "1.  The defendant actually believed that *he or Vincente Roldan* was in imminent danger of being killed or suffering great bodily injury;

---

14     Because we conclude there is substantial evidence to support a finding Chavez is guilty of the second degree murder of Crook based on the natural and probable consequences doctrine, we need not, and do not, address the question of whether there is also substantial evidence to support a finding he is guilty of second degree murder based on the alternative theory that he directly aided and abetted Gonzalez's murder of Crook.

31

"AND

"2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"BUT

"3. At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be;

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

B

"[E]ven in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citations.] The trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. [Citations.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 (*Montoya*).) In particular, a trial court must instruct sua sponte on a lesser included offense if the evidence would support that finding. (*People v. Leach* (1985) 41 Cal.3d 92, 106.)

32

However, a court is not required to so instruct when there is no evidence the offense was less than that charged.  (*People v. Ghent* (1987) 43 Cal.3d 739, 757.)

For a killing to be perfect self-defense and exonerate the defendant completely as a justifiable homicide, "the defendant must actually and reasonably believe in the need to defend."  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  However, "[i]f the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter.  [Citation.]."  (*Ibid*., fn. omitted.)  For either perfect or imperfect self-defense, the fear must be of imminent danger to life or great bodily injury.  (*Ibid*.)  "[A] defendant who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter."  (*People v. Blakeley* (2000) 23 Cal.4th 82, 91.)  "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter."  (*In re Christian S.* (1994) 7 Cal.4th 768, 771.)

Like imperfect self-defense, "one who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter."  (*People v. Randle* (2005) 35 Cal.4th 987, 997 (*Randle*); see *People v. Trujeque* (2015) 61 Cal.4th 227, 270-271 (*Trujeque*).)  For imperfect defense of another to apply, the defendant must, inter alia,

33

actually believe the immediate use of deadly force was necessary to defend another person against the danger of being killed or suffering great bodily injury. (CALCRIM No. 571.) Furthermore, for imperfect self-defense or imperfect defense of another to apply, the defendant must actually associate the threat of imminent danger of death or great bodily injury with the victim. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1068-1069 (*Minifie*).)

C

Chavez asserts the trial court erred by not modifying its instruction with CALCRIM No. 571 on imperfect self-defense or imperfect defense of another to include the possibility of his defense of Gonzalez. However, based on our review of the record, there is insufficient evidence in the record to support such an instruction. Specifically, there is insufficient evidence to support a finding that Chavez acted in the actual, but unreasonable, belief that Gonzalez was in imminent danger of being killed or suffering great bodily injury from Crook.[15] (CALCRIM No. 571; *Randle*, *supra*, 35 Cal.4th at

---

[15] To the extent Chavez argues there was substantial evidence to support a finding he acted in defense of Gonzalez while he fought with Lujan and others during the initial physical altercation, he misconstrues and/or misapplies the doctrine of imperfect defense of another. Crook, Gonzalez's shooting victim, was not present during the initial physical altercation and therefore there was insufficient evidence to support a finding that Chavez actually, but unreasonably, believed that Gonzalez was in imminent danger of being killed or suffering great bodily injury from Crook at that time. (*Randle*, *supra*, 35 Cal.4th at p. 997; *Trujeque*, *supra*, 61 Cal.4th at pp. 270-271; *Minifie*, *supra*, 13 Cal.4th at pp. 1068-1069.) Furthermore, Gonzalez was not arguably in imminent danger of anything from Crook until much later when Crook approached him from behind and tapped him on the shoulder. Even so, as we discuss *post*, there is insufficient evidence to support a finding that Chavez actually, but unreasonably, believed Gonzalez was in imminent danger of being killed or suffering great bodily injury from Crook.

p. 997; *Trujeque*, *supra*, 61 Cal.4th at pp. 270-271; *Minifie*, *supra*, 13 Cal.4th at pp. 1068-1069.)

Chavez apparently argues there is evidence to support a finding that he actually believed Crook was holding a glass goblet or other glass object that could be used as a deadly weapon and that when Crook approached Gonzalez from behind, he (Gonzalez) was in imminent danger of being struck by that weapon and being killed or suffering great bodily injury. However, there is insufficient evidence to support a finding that the object Crook was possibly holding at the time he tapped Gonzalez on the shoulder was, or appeared to be, a glass goblet or other glass object. Rather, the evidence supports, at most, a finding Crook was holding a plastic cup at the time he tapped Gonzalez on the shoulder from behind. The surveillance camera video recording, and still photographs taken therefrom, show Crook leaving the restaurant, placing a drink container on the flatbed truck, pushing past Juan Carlos Lopez, and then picking the container back up and heading southward out of the camera's view. Crook and Lujan approached Gonzalez, who was pointing his gun at Eddie Lopez's back, from behind and Crook tapped him (Gonzalez) on the shoulder. Gonzalez spun around and shot Crook twice at point-blank range, striking him in the chest near his armpit and in the upper right side of his back.

At trial, Juan Carlos Lopez identified the drink container that Crook placed on the flatbed truck and later picked up as a plastic michelada cup. As the restaurant's owner, Juan Carlos Lopez had served those drinks almost every day and the cups used were frosted plastic and had a red rim (apparently from chili powder). Although there was testimony that Crook had a shrimp cocktail earlier that evening, the container held by

35

Crook prior to the shooting, as shown in the video recording and still photographs and as identified by Juan Carlos Lopez, was a plastic michelada cup and not the type of glass shrimp cocktail container used by the restaurant. Juan Carlos Lopez described the type of container in which the restaurant served shrimp cocktails as glass with a big base, stem, and wide bowl or cup on top of the stem and weighing about three pounds. He estimated the width of its base as about three and one-half inches and its top bowl or cup as about five inches. He testified it "takes probably two hands to grab it. You can carry it with one, but the size of it is probably about that big [apparently gesturing with his hands]." He testified that the restaurant's plastic michelada cup and its glass shrimp cocktail cups looked "completely different."

Our independent review of the video recording and still photographs therefrom confirms that the object that Crook placed on the flatbed truck and later picked up before heading southward could not reasonably be believed to be one of the restaurant's shrimp cocktail glasses. Its sides are straight, slightly angling inward from top to bottom (i.e., a slight cone shape with a flat bottom). Its shape is entirely inconsistent with the shape of the restaurant's shrimp cocktail glass, as described by Juan Carlos Lopez, which we interpret, for lack of a better description, as having a top-heavy hourglass shape (i.e., curving or undulating sides) with a narrow stem in the middle. The object held by Crook appears to be frosted and contains a dark liquid. Juan Carlos Lopez testified that it was plastic (i.e., not glass), describing it as a plastic michelada cup, which looks completely different from a shrimp cocktail glass.

36

Based on all of the evidence in the record, there is insufficient evidence to support a finding that Crook was, or appeared to be, holding a heavy, three-pound shrimp cocktail glass when he approached Gonzalez from behind and tapped him on the shoulder. Accordingly, there likewise is insufficient evidence to support a finding that Chavez saw Crook approach Gonzalez from behind with such a heavy glass object and actually believed Gonzalez was in imminent danger of being struck by that glass object and being killed or suffering great bodily injury. Absent substantial evidence to support that finding, the trial court did not err by not modifying CALCRIM No. 571 to include Chavez's defense of Gonzalez in its instruction on imperfect defense of another. (*Montoya*, *supra*, 7 Cal.4th at p. 1047; *Randle*, *supra*, 35 Cal.4th at p. 997; *Trujeque*, *supra*, 61 Cal.4th at pp. 270-271; *Minifie*, *supra*, 13 Cal.4th at pp. 1068-1069.)

## GONZALEZ'S APPEAL

## V

### *CALCRIM No. 3471*

Gonzalez contends the trial court erred by instructing with CALCRIM No. 3471 on self-defense, but without its optional bracketed language stating that an aggressor who initially uses only nondeadly force regains the right to self-defense when his or her opponent counters with deadly force.

### A

The trial court instructed with CALCRIM No. 3471 on the right to self-defense in circumstances of mutual combat or where the defendant was the initial aggressor, stating:

37

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

"1.  He actually and in good faith tried to stop fighting;

"AND

"2.  He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

"AND

"3.  He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

In so instructing, the court omitted optional bracketed language from CALCRIM No.

3471, which states:

"However, if the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop the opponent[, or give the opponent a chance to stop fighting]."

B

As discussed *ante*, "even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citations.]  The trial court is charged with instructing upon every theory of the case

38

supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. [Citations.]" (*Montoya*, *supra*, 7 Cal.4th at p. 1047.) Evidence is substantial only if a reasonable jury could find it persuasive. (*Young*, *supra*, (2005) 34 Cal.4th at p. 1200.)

C

Gonzalez argues the trial court should have included the bracketed language, quoted *ante*, when instructing the jury with CALCRIM No. 3471 (i.e., if the jury found he initially used only nondeadly force and Crook responded with sudden and deadly force such that he could not withdraw from the fight, then he (Gonzalez) regained the right to defend himself with deadly force, whether in perfect or imperfect self-defense). However, contrary to Gonzalez's assertion, substantial evidence did not support the bracketed language the court omitted from CALCRIM No. 3471. The main premise of Gonzalez's argument is that there is substantial evidence to support a finding that Crook used, or appeared to use, deadly force (i.e., a heavy glass object) against him, but the only substantial evidence of a heavy glass object was regarding the beer bottle thrown by Eddie Lopez at the Gutierrez brothers. That bottle was not thrown at or toward Gonzalez, but was instead thrown in the opposite direction by Eddie Lopez, and Gonzalez was not charged with the murder of Eddie Lopez.

Nevertheless, Gonzalez argues there is substantial evidence to support a finding that the object possibly held by Crook when he (Crook) tapped him on the shoulder was, in fact, a heavy glass object. However, as we discussed in part IV(C) *ante* and which discussion we incorporate herein, the evidence admitted at trial (including the video

39

recording and still photographs from the surveillance camera and Juan Carlos Lopez's testimony) does *not* support a finding that Crook picked up a glass object off of the flatbed truck before heading toward Gonzalez. Instead, he, at most, picked up a plastic michelada cup before heading toward Gonzalez.

At trial, Juan Carlos Lopez, as discussed in section IV(C) *ante*, described the restaurant's plastic michelada cups and its glass shrimp cocktail cups and stated they looked "completely different." Likewise, as discussed in section IV(C) *ante*, our independent review of the video recording and still photographs therefrom confirms that the object that Crook placed on the flatbed truck and later picked up before heading southward could not reasonably be found to be one of the restaurant's shrimp cocktail glasses.

We likewise reject Gonzalez's alternative argument that there is substantial evidence to support a finding the object possibly held by Crook, if not a shrimp cocktail glass, was instead a beer glass with a "waist" in its middle or other similarly shaped goblet or container made of glass and not a plastic michelada cup with straight sides. The evidence discussed *ante* is inconsistent with such a finding and instead supports a finding only that the object was a plastic michelada cup, which could not have posed to Gonzalez any real or perceived threat of imminent danger of death or great bodily injury. Gonzalez merely speculates that Crook may have been holding a heavy object made of glass when

40

he approached Gonzalez from behind.[16]  His suggested interpretation of the object on the

flatbed truck shown in the video recording and still photographs from the surveillance

camera is not supported by our independent viewing of that evidence.

Accordingly, based on our review of the record and relevant evidence, there is

insufficient evidence to support a finding that Crook was holding, or appeared to be

holding, a heavy shrimp cocktail glass, glass goblet, or other object that appeared to be

made of glass when he approached Gonzalez from behind and tapped him on the

shoulder.  Absent substantial evidence supporting such a finding, there was insufficient

evidence to support a finding Gonzalez actually believed Crook posed an imminent

danger of death or great bodily injury to him or others that would justify Gonzalez's use

of perfect or imperfect self-defense by shooting Crook.  Accordingly, we conclude the

trial court did not err by omitting the bracketed language from CALCRIM No. 3471,

which would have allowed the jury to find Gonzalez regained his right to defend himself

if, inter alia, it found Crook used, or appeared to use, deadly force against him.

(*Montoya*, *supra*, 7 Cal.4th at p. 1047.)

VI

*CALCRIM No. 3472*

---

[16]    Gonzalez further speculates that the broken glass found by police near the scene
may have been from a glass goblet or other glass object held by Crook.  However,
National City Police Detective Alejandro Garcia testified that the "broken bottle" or
broken glass that he saw was located in front of a vacant building at 330 Highland
Avenue that was two stores away from the most southward area where blood drops,
presumably from Crook, were found (i.e., in front of a bakery) and therefore that broken
glass was not photographed.  Therefore, it cannot reasonably be inferred that the broken
glass found by police was from a glass object held by Crook at the time of the incident.

41

Gonzalez contends the trial court erred by instructing with CALCRIM No. 3472 but not modifying it with language stating that a person who provokes a fight with an intent to use nondeadly force regains the right to self-defense when his or her opponent counters with deadly force.

## A

Per the prosecution's request, the trial court instructed with CALCRIM No. 3472, without modification, as follows: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Gonzalez did not object to that instruction.

## B

As discussed *ante*, "even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citations.] The trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. [Citations.]" (*Montoya*, *supra*, 7 Cal.4th at p. 1047.) Evidence is substantial only if a reasonable jury could find it persuasive. (*Young*, *supra*, 34 Cal.4th at p. 1200.)

## C

Gonzalez argues the trial court erred by instructing with CALCRIM No. 3472, as quoted *ante*, without modifying it to include language permitting him to use perfect or imperfect self-defense if he initially used nondeadly force and Crook responded with

42

deadly force.  Alternatively stated, he argues the court should have modified CALCRIM No. 3472 to state those defenses are not available if he provoked the fight and created the circumstances that legally justified Crook's use of force.  (Cf. *People v. Enraca* (2012) 53 Cal.4th 735, 761; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 947-952; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 272; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180.)

However, as with CALCRIM No. 3471 discussed *ante*, we conclude the trial court did not err by omitting language modifying CALCRIM No. 3472 to allow for Gonzalez's possible perfect or imperfect self-defense if he provoked a fight with nondeadly force and Crook responded with deadly force (i.e., Gonzalez then regained the right to perfect or imperfect self-defense), because substantial evidence does not support a finding that Crook responded, or appeared to Gonzalez to respond, with deadly force.  As we discussed in part V(C) *ante*, there is insufficient evidence to support a finding that Crook was holding, or appeared to be holding, a heavy shrimp cocktail glass, glass goblet, or other object that appeared to be made of glass when he approached Gonzalez from behind and tapped him on the shoulder.  Absent substantial evidence supporting such a finding, there was insufficient evidence to support a finding Gonzalez actually believed Crook posed an imminent danger of death or great bodily injury to him or others (i.e., used, or appeared to use, deadly force) that would justify Gonzalez's perfect or imperfect self-defense by shooting Crook.  Accordingly, we conclude the trial court did not err by instructing with CALCRIM No. 3472 but not modifying it with language stating that a person who provokes a fight with an intent to use nondeadly force regains the right to

43

perfect or imperfect self-defense when his or her opponent counters with deadly force. (*Montoya*, *supra*, 7 Cal.4th at p. 1047.) Alternatively stated, the court did not err in instructing the jury with an unmodified version of CALCRIM No. 3472 in the circumstances of this case.[17]

## VII

*Admission of Evidence on Gonzalez's Death Threat*
*and Denial of His Motion for Mistrial*

Gonzalez contends the trial court abused its discretion under Evidence Code section 352 by admitting the testimony of Juan Carlos Lopez regarding the death threat he (Gonzalez) made to dissuade him from testifying at trial and also abused its discretion by denying his motion for mistrial based on admission of that evidence.

## A

In the course of discussing the parties' pretrial in limine motions, Gonzalez's counsel raised the issue of a report disclosed by the prosecution regarding its investigator's interview of Julio Martinez in which he (Martinez) stated that while he was in jail with Gonzalez, Gonzalez asked him to convey to Juan Carlos Lopez a threat to not come to court and indicated he knew his (Juan Carlos Lopez's) family. Gonzalez's counsel asked the trial court to preclude the prosecution from presenting Martinez's testimony. The prosecutor stated she intended to offer Martinez's testimony as relevant

---

[17] Assuming arguendo the trial court erred by giving CALCRIM No. 3472 or not modifying its language as Gonzalez asserts, "the error is merely technical and not grounds for reversal" (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1335) because, based on the evidence in this case, the jury necessarily would not have found Crook approached, or appeared to approach, Gonzalez with a deadly weapon (i.e., glass object).

to Gonzalez's consciousness of guilt based on his attempt to dissuade Juan Carlos Lopez from testifying. She made an offer of proof regarding Martinez's expected testimony, stating:

> "[W]hat happened is [Martinez] was in custody with Mr. Gonzalez April 16th or 20th[, 2015], the last time we were here. . . .
>
> "And what [Martinez] says is he and Mr. Gonzalez were chitchatting and it came about that they realized they both knew Juan Carlos Lopez.
>
> "At that time, Mr. Gonzalez told [Martinez] that could he get in touch with Mr. Lopez and basically tell him not to come to court, that he knew where he lived and where his children went to school and so forth, and then reiterated that he better not come to court and testify. He also referenced that Mr. Lopez had already testified at [his] preliminary hearing.
>
> "[Martinez] got out of custody within about 48 hours of that conversation and immediately contacted Mr. Lopez and Mr. Lopez's cousin, who he is married to. And Mr. Lopez received a couple of text messages. Mr. Lopez called [Martinez] back and [Martinez] relayed the conversation he had with Mr. Gonzalez."

The trial court tentatively ruled Martinez could testify, subject to a further objection.

In her direct examination of Juan Carlos Lopez, the prosecutor asked him whether he was nervous about testifying. He replied, "Yes." She asked him whether he had discomfort with talking to police and coming to court to testify regarding the incident. He replied, "Yes." When she asked why he had such discomfort, Gonzalez's counsel objected on grounds of relevancy.

At a sidebar conference outside of the jury's presence, Gonzalez's counsel stated he did not know "exactly what [Juan Carlos Lopez] is going to say. There were a lot of threats going back and forth . . . . He could say something so highly prejudicial and

inflammatory that would result in a mistrial."  The prosecutor made an offer of proof regarding how Juan Carlos Lopez was expected to testify, stating:  "[He] feels discomfort from both sides.  He's expressed to police, I think in prior statements and certainly to me, that he feels pressure from the neighborhood, because everybody feels like since he's the person that knows everybody that he should be the one to provide information on the one hand.  On the other hand, *he feels threatened by Mr. Gonzalez because of that phone call that we discussed earlier in our motions in limine*.  So I think he is going to express that he feels like he's getting it from all sides."  (Italics added.)  Gonzalez's counsel restated he did not know what Juan Carlos Lopez was going to say.

The trial court stated:

> "I don't know how to do [an Evidence Code section] 402 [hearing] on a witness. . . .  I think it all comes in. . . .  [I]t is my understanding that Mr. Gonzalez didn't directly talk to him, and so if he felt pressure, it wasn't directly from Mr. Gonzalez. . . .  [R]ight now it is not like he is going to say he heard it from Mr. Gonzalez."

The prosecutor stated that Juan Carlos Lopez had expressed fear of Gonzalez as a result of the threat that Martinez told him about.  She stated: "His boy, oldest boy goes to school with Mr. Gonzalez'[s] eldest daughter, and unbeknownst to him they are very good friends . . . ."  Both Gonzalez's counsel and Chavez's counsel submitted on the matter, stating they needed to cross-examine Juan Carlos Lopez to show he was pressured to come up with a story.  The court implicitly ruled the prosecutor could question Juan Carlos Lopez on the specifics of his discomfort in testifying.

In the presence of the jury, the prosecutor continued her questioning of Juan Carlo Lopez as follows:

46

"Q. Mr. Lopez, we were talking a bit about your discomfort in testifying. . . . Would you prefer not to testify here in court today?

"A. Yes.

"Q. And is it fair to say you're here because we subpoenaed you?

"A. Correct.

"Q. Why would you prefer not to testify?

"A. Most recently, the death threats.

"Q. Do you fear for your safety?

"A. Yes.

"Q. And that of your family?

"A. More my family than mine.
"Q. And you said, 'most recently.' At the beginning or onset of this case, did you have different concerns?

"A. Similar. I felt like it was coming—I don't know where it was coming from.

"Q. Fears for your safety?

"A. Correct.

"Q. Did you feel pressure from the neighborhood?

"A. Yes.

"Q. You mentioned there was a recent threat; is that right?

"A. Correct.

"Q. And was it a threat in regards to testifying?

"A. Yes. [¶] . . . [¶]

"Q. Did you receive a message urging you not to testify?

47

"A. Yes.

"Q. Who gave you that message?

"A. A gentleman by the name of Julio.

"Q. And how do you know Julio?

"A. I've known him for quite some time. He's related to my brother's wife. [¶] . . . [¶]

"Q. Did he tell you the content of that threat?

"A. Yes.

"Q. What did he tell you?

"[Gonzalez's counsel:] Objection, your honor. I call[s] for hearsay.

"THE COURT: And, ladies and gentlemen, I'm going to allow this information in . . . for a limited purpose. It is not for the truth of really what was said. It is for the impact on the person that heard it. Whether the words were true or not, this is just for how Mr. Lopez reacted. [¶] So go ahead. [¶] . . . [¶]

"Q [by the prosecutor]. What did he tell you?

"A. He told me that he had recently got a DUI and he was incarcerated. And while incarcerated he was . . . housed or in the same cell as Mr. Gonzalez. And Mr. Gonzalez somehow through their conversation came up why one or the other was inside or incarcerated, and it came out that Julio knew me. And [Gonzalez] said, do me a favor. When you get out, make sure you tell him not to testify or I'm going to kill his family and him.

"Q. What effect did this have on you?

"A. On me, personally, I have to use whatever resources I have to protect my family. [¶] On my family, it's taken a toll.

"Q. Has it caused worry and concern for you?

48

"A.  Yes.

"Q.  And worry and concern for you specifically about testifying?

"A.  Correct."

The prosecutor then questioned Juan Carlos Lopez about the restaurant's surveillance camera and the instant incident.

During a recess in the jury's absence, the trial court discussed with counsel Juan Carlos Lopez's testimony and stated:  "I have to say that . . . I shouldn't have been surprised by the detail with which Mr. Lopez gave the conversation he had with his friend, but part of my ruling, besides what we already have on the record, was in anticipation that the person who actually made the call that was in the cell [i.e., Martinez] was going to come in and testify in detail, which is I think we had a conversation before [the] trial started, so that [Gonzalez's counsel] would have an opportunity to cross-examine him on any conversation with Mr. Gonzalez."  Gonzalez's counsel stated:

> "I never imagined for a second that a hearsay statement of that
> nature, which can't be sanitized under any circumstances, because
> the prejudicial effect is so overwhelming, the probative value can
> certainly be minimized by the fact that he could say he got a threat
> not to testify and then, of course, [Martinez] can come in and talk
> about it and perhaps lay a better foundation.  But . . . it has such an
> explosive and prejudicial value to my client.  It is clearly a hearsay
> statement.  There are other methods by which he could indicate what
> his state of mind was, but not something as explosive as that."

Based on those concerns, Gonzalez's counsel moved for a mistrial.  The court took the motion under submission and suggested that Gonzalez's counsel could file a written motion.

Gonzalez's counsel subsequently filed a written motion for mistrial, arguing Juan Carlos Lopez's testimony regarding Gonzalez's death threat was inadmissible hearsay and, in particular, should not have been admitted as relevant to Juan Carlos Lopez's then-existing state of mind. He also argued the trial court abused its discretion under Evidence Code section 352 by admitting that testimony without an adequate limiting instruction and, in any event, no admonition or instruction to the jury could have cured the prejudice caused by Juan Carlos Lopez's testimony. Accordingly, he argued Gonzalez was denied his constitutional right to a fair trial.

The prosecutor opposed the mistrial motion, arguing Juan Carlos Lopez's testimony (and Martinez's follow-up testimony) was highly relevant to his credibility because of his inconsistent statements about the incident and the shooter's identity, his initial denial that the video recording existed, his possible edits to that recording, and his change in demeanor when asked on direct examination who the shooter was.

The trial court denied Gonzalez's motion for mistrial, stating that Juan Carlos Lopez's testimony was relevant to his credibility and to explain his "strong physical reaction" when on direct examination he identified Gonzalez as the shooter. The court acknowledged that when Juan Carlos Lopez testified about the details of Gonzalez's threat, the court was not anticipating that testimony but nevertheless knew about that threat because it was discussed before trial. The court referred to its admonition or limiting instruction and also stated Juan Carlos Lopez's testimony about Gonzalez's threat was not so prejudicial as to warrant a mistrial because Martinez was expected to testify regarding that threat anyway.

50

The prosecution subsequently presented testimony by Martinez regarding the details of the death threat that Gonzalez asked him to, and he (Martinez) did, convey to Juan Carlos Lopez. In particular, Martinez testified that while they were in custody together, Gonzalez asked him to relay a message to Juan Carlos Lopez to not show up in court and that he (Juan Carlos Lopez) was being a "snitch." Gonzalez told Martinez he knew Juan Carlos Lopez's family, knew where they lived, and where Juan Carlos Lopez's children went to high school, specifying it by name. Gonzalez stated he "didn't want to kill them," so Juan Carlos Lopez should not come to court. Martinez later conveyed Gonzalez's threat to Juan Carlos Lopez.

B

Gonzalez asserts the trial court abused its discretion under Evidence Code section 352 when it admitted the testimony of Juan Carlos Lopez regarding Gonzalez's death threat. In particular, he argues the court failed to exercise its discretion under Evidence Code section 352 and, in any event, no reasonable judge would have admitted that testimony without sanitizing its undue prejudicial effect. He argues the court's error violated his constitutional rights to due process and a fair trial, requiring reversal of his convictions.

Evidence Code section 352 provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or misleading the jury." The term "prejudice," within the meaning of Evidence Code section 352, is not simply damage to the defense that naturally flows from relevant

51

and highly probative evidence, but is instead an emotional reaction that inflames the jurors' emotions, motivating them to have a bias against, or to prejudge, an individual based on evidence that has only slight probative value on the issues. (*People v. Valdez* (2012) 55 Cal.4th 82, 145; *People v. Samuels* (2005) 36 Cal.4th 96, 124; *People v. Cole* (2004) 33 Cal.4th 1158, 1197; *People v. Zapien* (1993) 4 Cal.4th 929, 958.) Under that statute, evidence is substantially more prejudicial than probative if it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome and renders the defendant's trial fundamentally unfair. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Under Evidence Code section 352, a trial court need not expressly weigh the prejudicial effect of evidence against its probative value or even expressly state it has done so. (*People v. Williams* (1997) 16 Cal.4th 153, 213 (*Williams*).) Nevertheless, the record must show the trial court understood and fulfilled its responsibilities under that statute. (*Ibid.*)

On appeal, we apply the abuse of discretion standard in reviewing a trial court's ruling on the admissibility of evidence, including an Evidence Code section 352 objection to evidence. (*People v. Cox* (2003) 30 Cal.4th 916, 955.) We will reverse a trial court's ruling only if the record shows the court acted in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Williams* (2008) 43 Cal.4th 584, 634-635; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Based on our review of the record, we conclude the trial court did not abuse its discretion under Evidence Code section 352 by admitting Juan Carlos Lopez's testimony

52

regarding Gonzalez's threat and giving its limiting instruction on that testimony. First, we reject Gonzalez's assertion that the court was uninformed and therefore could not, and did not, weigh the possible prejudicial effect of that testimony against its probative value under Evidence Code section 352. At the sidebar conference on Gonzalez's objection to Juan Carlos Lopez's testimony on why he was uncomfortable testifying in court, his counsel stated he did not know "exactly what [Juan Carlos Lopez] is going to say. There were a lot of threats going back and forth . . . . He could say something so highly prejudicial and inflammatory that would result in a mistrial." In so doing, he implicitly raised the issue of whether Juan Carlos Lopez's testimony would be unduly prejudicial under Evidence Code section 352 and objected to that testimony on that ground. The prosecutor then made an offer of proof that Juan Carlos Lopez was expected to testify, inter alia, regarding Gonzalez's threat against him that was conveyed by Martinez, who also was expected to testify regarding that threat as discussed before trial and whose testimony was tentatively ruled as admissible by the court.[18] The court implicitly ruled the prosecutor could question Juan Carlos Lopez on the specifics of his discomfort in testifying, including Gonzalez's threat. In so doing, the court implicitly overruled Gonzalez's Evidence Code section 352 objection to Juan Carlos Lopez's expected testimony, including his testimony regarding Gonzalez's threat, presumably weighing the probative value of that expected testimony against its potential prejudicial effect and

---

[18]    The prosecutor stated, inter alia, that she expected Juan Carlos Lopez to testify that he "feels threatened by Mr. Gonzalez because of that phone call that we discussed earlier in our motions in limine [referring to Martinez's expected testimony regarding Gonzalez's threat]."

finding it was not unduly prejudicial. (*Williams*, *supra*, 16 Cal.4th at p. 213 ["[W]hen ruling on [an Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so."].)

Contrary to Gonzalez's assertion, there is no affirmative evidence in the record showing the court was either unaware of its discretion under Evidence Code section 352 to exclude that testimony or did not exercise that discretion. Rather, the record shows the court understood and fulfilled its responsibilities under Evidence Code section 352. (*Williams*, *supra*, 16 Cal.4th at p. 213.) To the extent Gonzalez asserts the trial court did not exercise its Evidence Code section 352 discretion because it failed to conduct an Evidence Code section 402 hearing on the expected testimony of Juan Carlos Lopez and therefore lacked "informed" discretion, we disagree. Gonzalez does not cite any authority showing a court must conduct an Evidence Code section 402 hearing before it may exercise "informed" discretion under Evidence Code section 352 and admit certain potentially prejudicial testimony. Furthermore, although Gonzalez refers to the court's comment that it "did not know how" to conduct an Evidence Code section 402 hearing on a witness's expected testimony, we presume the court was experienced in conducting Evidence Code section 402 hearings generally and therefore would have been able to conduct an appropriate Evidence Code section 402 hearing regarding the admissibility of Juan Carlos Lopez's expected testimony on Gonzalez's threat had Gonzalez's counsel requested one and/or had the court deemed such a hearing necessary or appropriate for it to exercise its Evidence Code section 352 discretion. In any event, the record supports an inference that the court found such a hearing was unnecessary, given the prosecutor's

54

subsequent offer of proof that summarized Juan Carlos Lopez's expected testimony on Gonzalez's threat and other reasons for being uncomfortable with testifying in court, and exercised its Evidence Code section 352 discretion to admit that testimony. Although his testimony ultimately was in greater detail than that described by the prosecutor, the court nevertheless exercised its discretion by admitting that testimony.

Second, we reject Gonzalez's assertion that the trial court abused its Evidence Code section 352 discretion by admitting Juan Carlos Lopez's testimony regarding his (Gonzalez's) threat. The court could have found Juan Carlos Lopez's expected testimony was highly relevant to his state of mind and credibility regarding his description of the incident and identification of Gonzalez as the shooter. Evidence of threats against a witness or fears of retaliation for testifying is relevant to the witness's credibility. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1142 ["evidence that [witness] feared retaliation for testifying against defendant was [properly] offered for the nonhearsay purpose of explaining inconsistencies in portions of her testimony"]; *People v. Burgener* (2003) 29 Cal.4th 833, 869 ["Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court."].) In light of the inconsistencies in Juan Carlos Lopez's previous statements and possible involvement in hiding and/or editing the surveillance camera video recording and his distressed appearance while identifying Gonzalez in court as the shooter, the court reasonably

55

concluded his testimony regarding the threat from Gonzalez was highly relevant to his state of mind and credibility.

The court could also have found any prejudice from that expected testimony would not be undue because the prosecutor planned to present similar testimony by Martinez regarding Gonzalez's threat, as discussed before trial. Contrary to Gonzalez's assertion, the expected testimony by Martinez regarding the threat did not necessarily make Juan Carlos Lopez's testimony regarding that threat unduly cumulative such that the court abused its discretion by admitting it. In particular, Juan Carlos Lopez's testimony was distinctly relevant to show his state of mind and credibility, whereas Martinez's testimony was relevant to Gonzalez's consciousness of guilt as well as providing evidentiary support for Juan Carlos Lopez's testimony regarding Gonzalez's threat.

Furthermore, the trial court could have concluded any prejudice from the admission of Juan Carlos Lopez's testimony regarding Gonzalez's threat could be minimized by a limiting instruction or admonition. Weighing the highly probative value of the expected testimony of Juan Carlos Lopez regarding Gonzalez's threat against its potential prejudicial effect, the court could reasonably conclude that expected testimony was not unduly prejudicial under Evidence Code section 352 and allow him to testify regarding Gonzalez's threat. In so doing, we conclude the court did not abuse its discretion under Evidence Code section 352. To the extent Gonzalez argues the court should have "sanitized" Juan Carlos Lopez's testimony by limiting the details of the nature or extent of Gonzalez's threat or otherwise, we are not persuaded the court was

56

required to do so in the circumstances of this case and the cases Gonzalez cites do not hold a trial court errs if it does not do so. (Cf. *People v. Mendoza* (2011) 52 Cal.4th 1056, 1083-1087 [trial court did not abuse its discretion by limiting witness's testimony regarding threat to reduce its possible prejudicial effect]; *People v. Wharton* (1991) 53 Cal.3d 522, 597-598 [trial court did not abuse its discretion by limiting witness's testimony to prosecution's offer of proof].)

Assuming arguendo the trial court abused its discretion under Evidence Code section 352 by allowing Juan Carlos Lopez to testify regarding Gonzalez's threat, we nevertheless would conclude that error was not prejudicial. First, immediately after Juan Carlos Lopez began testifying about Gonzalez's threat in greater detail than the court expected, the court gave a limiting instruction to minimize any possible prejudicial effect. The court admonished the jury: "I'm going to allow this information in . . . for a limited purpose. It is not for the truth of really what was said. It is for the impact on the person that heard it. Whether the words were true or not, this is just for how Mr. Lopez reacted." Absent affirmative evidence in the record showing otherwise, we presume the jury followed the court's instruction and considered Juan Carlos Lopez's testimony regarding Gonzalez's threat only for its impact on him (i.e., his state of mind and credibility) and not for its truth (i.e., whether Gonzalez did, in fact, threaten him). (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) Accordingly, we conclude the court's limiting instruction cured or minimized, if not eliminated, any possible prejudicial effect of his testimony.

Furthermore, as anticipated, Martinez subsequently testified, without objection by Gonzalez, regarding Gonzalez's threat against Juan Carlos Lopez and his family that he

(Martinez) conveyed to Juan Carlos Lopez and so testified in as much, or greater, detail as did Juan Carlos Lopez. Unlike Juan Carlos Lopez's testimony regarding Gonzalez's threat, Martinez's testimony regarding that threat was admitted for the truth of the matter asserted and was relevant to show Gonzalez's consciousness of guilt. (*People v. Valdez* (2012) 55 Cal.4th 82, 135, fn. 32; *People v. Slocum* (1975) 52 Cal.App.3d 867, 887.) Therefore, even had the trial court excluded Juan Carlos Lopez's testimony about Gonzalez's threat, it is not reasonably probable Gonzalez would have obtained a more favorable verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Even under the less forgiving standard for federal constitutional error, we conclude any error in admitting Juan Carlos Lopez's testimony regarding Gonzalez's threat was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.) Accordingly, contrary to Gonzalez's assertion, any error under Evidence Code section 352 by the trial court in admitting Juan Carlos Lopez's testimony regarding his (Gonzalez's) threat does not require reversal of his convictions.

C

Gonzalez also asserts the trial court abused its discretion by denying his motion for mistrial based on the court's purported abuse of discretion in admitting Juan Carlos Lopez's testimony regarding his (Gonzalez's) threat. "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) "A motion for a

58

mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198-199 (*Collins*).) On appeal, we apply the abuse of discretion standard in reviewing a trial court's denial of a motion for mistrial. (*People v. Davis* (2005) 36 Cal.4th 510, 553 (*Davis*); *People v. Cox* (2003) 30 Cal.4th 916, 953.)

In denying Gonzalez's motion for a mistrial, the trial court concluded Juan Carlos Lopez's testimony regarding Gonzalez's threat was relevant to his credibility and was not so prejudicial as to warrant a mistrial because Martinez was expected to testify regarding that threat anyway and it gave an admonition or limiting instruction. Based on our review of the record, we conclude the court did not abuse its discretion by denying Gonzalez's motion for mistrial. (*Davis*, *supra*, 36 Cal.4th at p. 553; *Cox*, *supra*, 30 Cal.4th at p. 953.) As we discussed *ante*, the court did not abuse its discretion under Evidence Code section 352 by admitting Juan Carlos Lopez's testimony regarding Gonzalez's threat. Furthermore, as we discussed *ante*, assuming arguendo the court so erred, that error was not prejudicial under any standard of prejudice. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Chapman*, *supra*, 386 U.S. at p. 24.) Contrary to Gonzalez's assertion, the admission of Juan Carlos Lopez's testimony regarding Gonzalez's threat did not result in a miscarriage of justice or deny him his constitutional right to a fair trial. (*People v. Collins*, *supra*, 49 Cal.4th at pp. 198-199.)

VIII

*Alternative Contentions*

59

Gonzalez alternatively contends that if his counsel did not adequately request the trial court to exercise its Evidence Code section 352 discretion to exclude and/or sanitize Juan Carlos Lopez's testimony regarding his threat, adequately request an Evidence Code section 402 hearing, or request that the court sanitize that testimony by limiting it to the prosecutor's offer of proof, he was denied his constitutional right to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685.) However, we do not base our disposition of this appeal on any errors by Gonzalez's counsel and, in any event, any such asserted errors were not prejudicial (i.e., it is not reasonably probable Gonzalez would have obtained a more favorable verdict had his counsel not made those errors). (*Strickland*, at pp. 687-694.) Accordingly, we reject Gonzalez's alternative contentions.[19]

IX

*Senate Bill No. 620 Retroactivity*

Gonzalez contends 2017 Senate Bill No. 620, which amended section 12022.53, subdivision (h), as of January 1, 2018, should be applied retroactively to his nonfinal judgment and therefore the matter should be remanded for resentencing to allow the trial court to exercise its new discretion to strike or dismiss the 25-year-to-life section 12022.53 firearm enhancement that it originally imposed on him pursuant to the prior version of section 12022.53.

---

[19]   Likewise, because we conclude the trial court did not err as Gonzalez asserts, there is no cumulative prejudice from any such purported errors that requires reversal of his convictions. (Cf. *People v. Anderson* (2001) 25 Cal.4th 543, 606; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

After the parties filed their briefs and oral argument was set in this matter, Gonzalez filed a motion for leave to file a supplemental brief on the issue of whether newly enacted Senate Bill No. 620 should be applied retroactively to his nonfinal judgment. We granted that motion and accepted for filing his supplemental brief that argued Senate Bill No. 620 should be applied retroactively to nonfinal judgments, including the judgment in his case, and the matter should be remanded for resentencing to allow the trial court to exercise its discretion to strike or dismiss the section 12022.53 firearm enhancement that it imposed at his sentencing. The People filed a respondent's brief, conceding that Senate Bill No. 620 should be applied retroactively to all nonfinal judgments, but arguing remand for resentencing was unnecessary because the record clearly shows the trial court would not exercise its new discretion to strike or dismiss the section 12022.53 enhancement if the matter were remanded. We subsequently granted leave for the San Diego County District Attorney to file, and accepted for filing, an amicus curiae brief arguing that Senate Bill No. 620 should not be applied retroactively. Gonzalez filed a reply to that amicus brief and concurrently requested that we take judicial notice of six documents relating to the legislative history of Senate Bill No. 620. On January 23, 2018, we issued an order stating that his request for judicial notice would be considered concurrently with this appeal. We now grant his request and take judicial notice of the documents relating to Senate Bill No. 620's legislative history. (Evid. Code, § 452, subds. (a), (c).)

B

61

At the time of Gonzalez's murder offense, conviction, and sentencing, the former version of section 12022.53 required the trial court to impose a consecutive enhancement of 25 years to life for the jury's true finding on the allegation that he personally and intentionally discharged a firearm in committing the murder. (Former § 12022.53, subds. (d), (h).)[20] On October 11, 2017, the Governor signed Senate Bill No. 620, which became effective on January 1, 2018. (Stats. 2017, ch. 682, § 2.) Senate Bill No. 620 amended section 12022.53, subdivision (h) to now provide: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, § 2.) Gonzalez argues that because his judgment is not yet final, amended section 12022.53, subdivision (h) should be applied retroactively to his case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) and *People v. Francis* (1969) 71 Cal.2d 66 (*Francis*). The People agree that amended section 12022.53, subdivision (h) should apply retroactively to all nonfinal judgments, but argue remand for resentencing is unnecessary because the record clearly shows the trial court would not exercise its discretion to strike or dismiss that section 12022.53 enhancement in the circumstances of this case.

---

[20]    Former section 12022.53, subdivision (h) provided: "Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section."

62

In *Estrada*, the California Supreme Court held that a statute that reduces the punishment for an offense will generally apply retroactively to any case in which the judgment is not yet final before the effective date of the statute. (*Estrada*, *supra*, 63 Cal.2d at pp. 742, 744-745.) *Estrada* stated: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Id*. at p. 745.) Although section 3 generally provides that no Penal Code statute " 'is retroactive, unless expressly so declared,' " *Estrada* concluded that general rule of construction did not apply where it can be discerned from the language of the statute and other factors that the Legislature intended the amended statute to apply to all judgments not yet final. (*Estrada* at pp. 746, fn. 1, 747.) Therefore, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (*Id*. at p. 748.)

In *Francis*, the California Supreme Court extended the *Estrada* rule to a statute that modified the punishment for possession of marijuana, which formerly had been strictly a felony offense, to permit a trial court to treat that offense as a misdemeanor instead of a felony. (*Francis*, *supra*, 69 Cal.2d at pp. 75-76.) *Francis* concluded that the

63

amended statute giving the trial court discretion to impose either a felony sentence or a misdemeanor sentence applied retroactively "because the Legislature has determined that the former penalty provisions may have been too severe in some cases and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances." (*Id*. at p. 76.)

The court recently described its *Estrada* rule, stating: "The *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*People v. Conley* (2016) 63 Cal.4th 646, 657.)

In its amicus brief, the San Diego County District Attorney argues that the California Supreme Court's decision in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*) narrowed the holdings in *Estrada* and *Francis* and precluded retroactive application of amended section 12022.53, subdivision (h) to the nonfinal judgment in this case. In *Brown*, the court considered whether the 2010 amendment to section 4019, temporarily increasing conduct credits for prisoners in local custody, should be applied retroactively. (*Brown*, at pp. 317-318.) Finding no indicia showing that the Legislature intended amended section 4019 to apply retroactively, *Brown* concluded that section 3's presumption of prospective application of statutes controlled and precluded retroactive application of the amended statute. (*Id*. at pp. 319-323.) In so doing, the court distinguished *Estrada*, which dealt with a statute mitigating punishment for a particular crime, from amended section 4019, which dealt with conduct credits in a custodial setting

64

and not the punishment for a crime. (*Id*. at pp. 323-325.) *Brown* stated: "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Id*. at p. 324.) Citing that language and other language from *Brown*, the San Diego County District Attorney argues that *Brown*, in effect, limited the *Estrada* rule and, in particular, *Francis*'s interpretation and application of that rule and therefore *Francis* does not support retroactive application of amended section 12022.53 to the nonfinal judgment in this case.

However, in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*), the California Supreme Court recently reaffirmed its reasoning in *Estrada* and *Francis* in holding that Proposition 57, which reduced the possible punishment for juveniles, applies retroactively to punishment of juvenile defendants whose judgments are not yet final. (*Lara*, at pp. 303, 307-309.) "Proposition 57 prohibits prosecutors from charging juveniles with crimes directly in adult court. Instead, they must commence the action in juvenile court. If the prosecution wishes to try the juvenile as an adult, the juvenile court must conduct what we call a 'transfer hearing' to determine whether the matter should remain in juvenile court or be transferred to adult court. Only if the juvenile court transfers the matter to adult court can the juvenile be tried and sentenced as an adult. (Welf. & Inst. Code, § 707, subd. (a).)" (*Lara*, at p. 303.) *Lara* stated:

65

> "Proposition 57's effect is different from the statutory changes in *Estrada* . . . and *Francis* . . . . Proposition 57 did not ameliorate the punishment, or possible punishment, for a particular crime; rather, it ameliorated the possible punishment for a class of persons, namely juveniles. But the same inference of retroactivity should apply."
> (*Id*. at p. 308.)

The court explained: "Proposition 57 is an 'ameliorative change[] to the criminal law' that we infer the legislative body intended 'to extend as broadly as possible.' [Citation.] Nothing in Proposition 57 itself or the ballot materials rebuts this inference." (*Id.* at p. 309.) The court distinguished its case from the circumstances in *Brown*, which addressed an amended statute affecting only good behavior credits in a custodial setting. (*Id*. at p. 311.) Proposition 57 does not address future conduct or provide incentives for good behavior, but instead may affect a juvenile's effective sentence or juvenile disposition for past criminal conduct. (*Ibid*.) The court noted that it stated in *Brown* that *Estrada* is properly understood " 'as informing the rule's [section 3 default rule of prospective operation] in a specific context by articulating the reasonable presumption that a legislative act mitigating punishment for a particular criminal offense is intended to apply to all nonfinal judgments.' " (*Ibid*.) Explaining that language in *Brown*, *Lara* stated: "[W]e did not mean to state, and could not have held as binding precedent, that under no other circumstances, no matter how similar to *Estrada*, and how different from *Brown*, could *Estrada*'s inference in favor of retroactivity apply." (*Ibid*.) *Lara* noted that even *Brown* itself recognized that the amended statute in that case was not analogous to the amended statute in *Estrada*. (*Id*. at p. 312.) *Lara* concluded: "[T]he provisions of Proposition 57 at issue *are* analogous to the *Estrada* situation, and *Estrada*'s logic *does*

66

apply. *Brown* presents no impediment to invoking *Estrada*'s inference in this case."

(*Ibid*.) Accordingly, the court held that Proposition 57 applied retroactively to all

nonfinal criminal judgments involving juvenile defendants.[21] (*Lara*, at pp. 303-304.)

Based on the California Supreme Court's reaffirmance in *Lara* of its reasoning in

*Estrada* and *Francis*, we conclude, contrary to the San Diego County District Attorney's

position, that the reasoning and holdings in those cases remain valid today and were not

restricted or overruled by *Brown*. In fact, *Lara* confirms, if not expands, *Estrada*'s

approach to retroactivity by applying Proposition 57, which, in effect, reduced the

possible punishment for juveniles, retroactively to punishment of juvenile defendants

whose judgments are not yet final.

Applying the reasoning and holdings in *Estrada* and *Francis* to the instant statute

amended by Senate Bill No. 620 in this case (i.e., § 12022.53, subd. (h)), we conclude

that the amended statute's provision giving the trial court discretion under section 1385 to

strike or dismiss a section 12022.53 firearm enhancement reduces the possible

punishment for certain qualifying offenses involving the personal use of a firearm.

---

[21] We agree with our concurring and dissenting colleague that although the Supreme Court has variously characterized the *Estrada/Francis* rule as both a "presumption" and an "inference," in *Lara* the court expresses a preference for the latter terminology, and we adhere to that in our descriptions here. (*Lara*, *supra*, 4 Cal.5th at p. 308, fn. 5; but see *People v. DeHoyos* (Mar. 12, 2018, S228230) __ Cal.5th __ [2018 Cal. Lexis 1496].) But the nomenclature makes little or no functional difference in the context of statutory interpretation, which presents a clear question of law for the court. *Estrada* and *Francis* dictate that where a statutory amendment actually or potentially reduces punishment for a crime, in the absence of other evidence we either *infer* or *presume* a legislative intent that the amendment will apply retroactively to all cases not final on appeal. We then look to any other available evidence to discern a contrary legislative intent.

Therefore, amended section 12022.53, subdivision (h) is similar to the amended statute in *Francis* that gave the trial court discretion to sentence a defendant for possession of marijuana either as a felony or as a misdemeanor. In both situations, the amended statute gave the trial court sentencing discretion that it did not have under the prior statute and, in effect, reduced the possible punishment for an offense or offenses. Because amended section 12022.53 does not contain any express savings clause and there is nothing in its legislative history indicating it was intended to apply only prospectively, we conclude that *Francis* is controlling authority and requires the retroactive application of amended section 12022.53, subdivision (h) to all nonfinal judgments. (*People v. Robbins* (2018) 19 Cal.App.5th 660 (*Robbins*); *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court."].) *Robbins* stated: "There is nothing in the language of section 12022.53, subdivision (h), or in the broader language of the Senate Bill, indicating the Legislature intended the subdivision to be only prospective. [Citation.] Accordingly, we conclude section 12022.53, subdivision (h), may be applied in the instant case because (1) it vests the trial court with authority to lower defendant's sentence, and (2) defendant's sentence was not final at the time the subdivision became effective." (*Robbins*, at p. 679.) We agree with *Robbins* and conclude amended section 12022.53, subdivision (h), applies to all nonfinal judgments.

C

68

Notwithstanding our conclusion *ante* that section 12022.53, subdivision (h) as amended by Senate Bill No. 620, applies retroactively to all nonfinal judgments, we conclude, contrary to Gonzalez's assertion, that remand for resentencing is not required in the circumstances of this case. Under *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 (*Gutierrez*), we need not remand a case if the record shows the trial court "would not . . . have exercised its discretion to lessen the sentence" even if it had known it had that discretion. In *Gutierrez*, the court cited the maximum sentence imposed by the trial court, as well as the court's comments at sentencing, as support for its conclusion that "no purpose would be served" by a remand for resentencing. (*Ibid.*)

At Gonzalez's sentencing, the trial court expressed its concern regarding his criminal history, his "senseless" shooting of Crook, and his use of a gun while he (Gonzalez) was out on bail on a previous gun charge. The court stated:

> "I have gone through . . . the probation report and considered the factors in aggravation and mitigation. And, unfortunately, there really were no factors in mitigation in this crime. You have a lengthy criminal history. You obviously have been in front of me and been very polite and never caused any trouble in court, but looking back at your criminal history, it's lengthy. There [are] preprison sentences, multiple convictions for domestic violence. And I'm struck by the fact you are out on bail for a gun charge and when you are out on bail you arm yourself, and here we are today with the senseless murder of Mr. Crook. I take that all into consideration when determining whether it's appropriate to consider concurrent sentences for some of these, as opposed to consecutive [sentences]. [W]ith no factors in mitigation and the loss of Mr. Crook, I don't find any reason to run any of the [sentences for the] crimes concurrently."

Accordingly, the court imposed a term of 15 years to life for count 1, with a consecutive enhancement of 25 years to life under section 12022.53, subdivision (d) for a total

69

indeterminate term of 40 years to life in prison. It also imposed a total determinate term of seven years eight months for count 2, the section 12022.1, subdivision (b) enhancement, and Gonzalez's three prison prior convictions.

Based on the trial court's comments at Gonzalez's sentencing, we conclude, as the People argue, that the record clearly shows the court would not exercise its new discretion under Senate Bill No. 620 to strike or dismiss the section 12022.53 enhancement if we were to remand the matter for resentencing. (*Gutierrez*, *supra*, 48 Cal.App.4th at p. 1896.) In particular, the court noted Gonzalez had a lengthy criminal history and no mitigating factors. Most importantly, Gonzalez was out on bail on a pending gun charge when he armed himself with a gun and committed the "senseless murder" of Crook. Given those egregious circumstances and the trial court's imposition of the maximum sentence possible, we conclude the court would *not* exercise its new discretion to strike or dismiss the section 12022.53 enhancement if we were to remand the matter for resentencing. Because no purpose would be served by a remand for resentencing, we decline to order a remand for resentencing and affirm the court's imposition of the section 12022.53 enhancement. (*Gutierrez*, at p. 1896.)

DISPOSITION

The judgments are affirmed. The superior court is directed to issue a new minute order nunc pro tunc reflecting its imposition of a consecutive two-year term for Gonzalez's conviction on count 2. The superior court clerk is directed to prepare an amended abstract of judgment reflecting the imposition of a consecutive two-year term

for Gonzalez's conviction on count 2 and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


NARES, J.

I CONCUR:


DATO, J.

71

BENKE, J., Concurring and dissenting.

I concur with my colleagues on the issue of retroactivity of Penal Code[1] section 12022.53, subdivision (h).  However, I do so by way of application of the *inference* recently recognized by our Supreme Court in *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308, footnote 5 (*Lara*).  Based on what I believe to be guidance in *Lara*, I would abandon application of a "presumption" of retroactivity in Penal Code statutes that reduce sentences.  On the question of remand, unlike the majority, I would give the trial court the opportunity to exercise its sentencing discretion.  On all remaining issues, I agree with my colleagues.

Relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*), and recent case law,[2] my colleagues conclude section 12022.53, subdivision (h) must be applied retroactively.  These cases, and apparently the majority as well, conclude that in all nonfinal cases, in the absence of evidence to the contrary, courts may *presume* the Legislature intends a statutory amendment reducing criminal punishment apply retroactively.[3]  This is where I part company with my colleagues.

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

[2]    See *People v. Woods* (2018) 19 Cal.App.5th 1080, *People v. Robbins* (2018) 19 Cal.App.5th 660 (*Robbins*).

[3]    In *Robbins*, the court, which did not have the benefit of *Lara*, stated:  "Unless there is evidence to the contrary, courts presume that the Legislature intends for a statutory amendment reducing criminal punishment to apply retroactively in cases that are not yet final on appeal.  [Citations.]  This presumption is applied not only to amendments reducing a criminal penalty, but also to amendments giving the trial court discretion to impose a lesser penalty.  [Citation.]"  (*Robbins, supra*, 19 Cal.App.5th

There is no such presumption, either in the Penal Code or in the governing law provided to us by the Supreme Court. Indeed, with respect to penal statutes, even those reducing in general the punishment for crimes, our analysis must begin with the contrary presumption. Section 3 clearly states, "No part of (the Penal Code) is retroactive, unless expressly so declared."[4] "[T]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, 'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application.' [Citations.] Accordingly, ' "a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective." ' " (*Brown,* at p. 324.)[5]

---

at p. 678.) The majority cite *Robbins* with approval and rely upon it. (Maj. opn., at p. 69.)

[4]      The presumption of prospective application is not unique to the Penal Code. It appears in identical language in section 3 of the Civil Code and section 3 of the Code of Civil Procedure. The Welfare and Institutions Code, which is the subject of analysis in *Lara*, contains no such provision, hence there is no presumption of prospective application involved in *Lara*. Rather, *Lara* begins with a discussion concerning the ameliorative effects expressly intended for juveniles in the whole of the Welfare and Institutions Code. (*Lara, supra*, 4 Cal.5th at p. 307, citing *Estrada, supra*, 63 Cal.2d at p. 744.) The court thus finds there is a clear and express legislative intent to credit juveniles with all available reform benefits. Therefore, the court notes that *Estrada* is not on point because it applies to the question of retroactivity of penal statutes. The rationale of *Estrada,* however, does apply. As footnote 5 instructs, *Estrada*'s rationale as to whether the Legislature intends that a statute reducing sentences is applied retroactively, depends on the *evidence* drawn from all of the circumstances surrounding passage of the new statute. (*Lara,* at p. 308, fn. 5.)

[5]      The court in *Brown* recognized that language in *Estrada*, if literally or broadly applied, was inconsistent with the principles embodied in section 3. (*Brown, supra*, 54

2

Neither section 12022.53 nor subdivision (h) contain language expressly stating the statute is to be applied retroactively. Therefore, in the absence of evidence to the contrary, the presumption to be applied is that section 12022.53, subdivision (h) is prospective. We may overcome this presumption only by examination of the Legislature's intent in enacting the new statute.[6]

The California Supreme Court recently addressed the application of *Estrada.* As the court explains in *Lara,* "We have occasionally referred to *Estrada* as reflecting a 'presumption.' (E.g., [*People v.*] *Conley* [(2016)] 63 Cal.4th [646] at p. 656; [*Brown, supra,*] 54 Cal.4th . . . [at p.] 324.) We meant this to convey that ordinarily it is

---

Cal.4th at pp. 324-325.) Accordingly, in *Brown,* the court expressly limited the scope of *Estrada*: "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown,* at p. 324.) In *Brown,* the court went on to hold that a temporary increase in good conduct credits an inmate could earn under former section 4019 was not outside the mandate of section 3 and therefore would not be applied retrospectively. (*Brown*, at p. 325.) The credits were not mitigation of the punishment for a particular criminal offense and thus did not on their face suggest the Legislature intended that they apply to all nonfinal judgments. (*Ibid.*; see *In re Pedro T.* (1994) 8 Cal.4th 1041, 1045 ["[o]rdinarily when an amendment lessens the punishment for a crime, one may reasonably *infer* the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest"], italics added; accord, *People v. Nasalga* (1996) 12 Cal.4th 784, 792.)

[6]    The Supreme Court has been at some pains to emphasize for us that the question of whether a statute is to be given retrospective application is a matter of legislative intent. (See *In re Pedro T., supra*, 8 Cal.4th at pp. 1046-1047; *People v. Nasalga, supra*, 12 Cal.4th at pp. 793-794; *People v. Conley* (2016) 63 Cal.4th 646, 657-659 (*Conley*); *Brown, supra*, 54 Cal.4th at p. 324; *Lara, supra*, 4 Cal.5th at p. 308.) Indeed, in *Estrada* itself, the court emphasized: "The problem," we explained, "is one of trying to ascertain the legislative intent—did the Legislature intend the old or new statute to apply?" (*Estrada, supra*, 63 Cal.2d at p. 744.)

3

reasonable *to infer* for purposes of statutory construction the Legislature intended a reduction in punishment to apply retroactively." (*Lara, supra*, 4 Cal.5th at p. 308, fn. 5; see *People v. DeHoyos* (Mar. 12, 2018, S228230) __Cal.5th__ [2018 Cal. Lexis 1496].)

The language of footnote 5 in *Lara* is significant and merits our careful consideration. "A *presumption* is an assumption of a fact that the law *requires* to be made from another fact or group of facts found or otherwise established in an action. A presumption is not evidence." (Evid. Code, § 600, subd. (a), italics added.) In contrast, an *inference* is only a "deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in an action." (*Id.,* subd. (b); see *Morton v. Manhattan Lunch Co*. (1940) 41 Cal.App.2d 70, 72 [an inference is a form of indirect evidence].) Thus, for me, the court's terminology marks an important clarification in the way *Estrada* is to be applied, and avoids any conflict with section 3. Because, in light of *Lara*, it is now clear *Estrada* simply recognized a permissible *evidentiary inference, Lara* expressly limits the reach of *Estrada*; it does not, as my colleagues suggest, expand *Estrada.* (See Evid. Code, § 600; maj. opn. at p. 69.)

At this point, especially in light of *Lara*, I do not think it is appropriate to restrict our analysis to application of a *presumption* that ameliorative changes in penal statutes must be applied retroactively. Rather, when, as here, a criminal defendant argues he or she is entitled to the benefit of new legislation, we must begin with the *contrary* presumption, expressly set forth in section 3, that unless there is express language to the contrary, statues are prospective only. If there is any ambiguity in the new enactment with respect to retroactivity, we then resolve that ambiguity by resort to familiar rules of

4

statutory history and construction, including the *inference* found by the court in *Estrada, supra*, 63 Cal.2d at page 745. (See *Brown, supra*, 54 Cal.4th at pp. 324-325.)

Turning to Senate Bill No. 620 (SB 620), I note the discretion section 12022.53, subdivision (h) now provides trial courts is not a certain reduction in punishment. However, provisions which give trial courts discretion to reduce a sentence previously required by the Penal Code are nonetheless changes which benefit offenders who committed particular offenses or engaged in particular conduct and, as in *Estrada,* manifest an intent by the Legislature that such offenders be given the benefit of that discretion in all cases which are not yet final. (*People v. Francis* (1969) 71 Cal.2d 66, 76.) "[T]here is such an inference because the Legislature has determined that the former penalty provisions may have been too severe in some cases and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances." (*Ibid*.) In sum then, the very discretion now provided by section 12022.53, subdivision (h) creates an inference the Legislature intended that in cases not yet final, offenders subject to the firearm enhancement set forth in section 12022.53 be given the benefit of that discretion. (*Francis,* at p. 76.)

The discretion which the Legislature provided trial courts is not the only indication the Legislature intended retrospective application of SB 620. Section 12022.53, subdivision (h) states that "[t]he authority provided by this subdivision applies to any resentencing that may occur *pursuant to any other law*." (Italics added.) By its express terms, this provision extends the benefits of SB 620 to defendants who have exhausted their rights to appeal and for whom a judgment of conviction has been entered but who

5

have obtained collateral relief by way of a state or federal habeas proceeding. This extension of SB 620 is a further expression by the Legislature of its understanding that the new version of section 12022.53, subdivision (h) would also be applied to all cases which were not final at the time it became effective. It is difficult to perceive a rationale for giving relief to a defendant whose judgment might be several years old, but who was a successful habeas litigant and provide no relief to a defendant whose conviction was entered in a trial court as recently as December 29, 2017. We assume the Legislature was well aware of this unfair result if the statute was not retroactive.

In sum, it is not necessary or legally sound to employ a presumption that is at odds with section 3. The Legislature, in enacting SB 620 has made it clear it intended and expected that its provisions would be applied to all cases pending at the time it became effective and, thus, it is outside the general rule set forth in section 3. (See *Brown, supra*, 54 Cal.4th at p. 325.)

Finally, I part company with my colleagues on the question of whether this case should be remanded. I believe it should. Given the multiple offenses at issue here, and the discretion available, I would give the trial court the opportunity to exercise that discretion with respect to defendant's firearm enhancement.

BENKE, Acting P. J.

6